(No. 52626.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JOHN L. SZABO, Appellant.

*Opinion filed January 24, 1983.—Rehearing
denied April 8, 1983.*

328

330

SIMON, J., specially concurring.

RYAN, C.J., and WARD and UNDERWOOD, JJ., concurring in part and dissenting in part.

Robert Agostinelli, Deputy Defender, and Verlin R.F. Meinz, Assistant Defender, of Ottawa, and Charles M. Schiedel, Assistant Appellate Defender, of Springfield, all of the Office of the State Appellate Defender, for appellant.

Tyrone C. Fahner and Neil F. Hartigan, Attorneys General, of Springfield (Herbert L. Caplan, Melbourne A. Noel, Jr., Michael B. Weinstein, and Darrell Panethiere, Assistant Attorneys General, and Scott Nelson, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, John Szabo, was indicted by a Will County grand jury for two counts of intentional murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), and two counts of felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), as well as one count of conspiracy to commit armed robbery (Ill. Rev. Stat. 1979, ch. 38, pars. 8—2(a), 18—2(a)). Following a bench trial on July 16-24, 1979, in the circuit court of Will County, he was found guilty on all counts. The State then requested a hearing to determine whether the death penalty should be imposed (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)). The defendant chose to have a jury impaneled for the sentencing hearing. At the conclusion of the hearing the defendant was sentenced to death for the murders. The court also imposed a three-year sentence of imprisonment for conspiracy. Szabo appeals both the convictions and sentence directly to this court pursuant to article VI, section 4(b), of the 1970 Illinois Constitution and Rule 603 (73 Ill. 2d R. 603). The sentences were stayed pending appeal.

In the early morning hours of January 27, 1979, the

bodies of John Rajca, age 19, and his brother Christopher (Chris) Rajca, age 17, were discovered on a farm road near Naperville, close to the entrance to the Avery Gravel Pit. The cause of John Rajca's death was determined to be a bullet wound to the chest; Chris Rajca had died of multiple stab wounds. A 1974 Vega station wagon, identified as the Rajca family car, was parked near the entrance to the gravel pit. There was a bullet hole through the left front seat of the Vega, and there were powder burns on the right front seat. Will County investigators searched the scene and recovered a spent projectile from a .38-caliber revolver from the ground near the Vega, and a black and red ski glove from inside the Vega. The Vega's keys were later found on the ground at some distance from the spot where the car had been parked.

The State's principal witness at trial was Robert Leatherman, Szabo's alleged accomplice in the crimes. Leatherman testified pursuant to an agreement with the State. According to the agreement, Leatherman, who was 16 when the offenses were committed, would admit to the two murders as a juvenile and would be committed to the Juvenile Division of the Department of Corrections until he reached 21. Since the only issue Szabo raises with regard to the validity of his conviction concerns his asserted inability to conduct effective cross-examination of Leatherman, due to the trial court's refusal to order discovery of certain pretrial statements made by Leatherman to an assistant State's Attorney, it will be necessary to recount Leatherman's testimony in some detail.

### TESTIMONY OF ROBERT LEATHERMAN

Leatherman, who was expelled from high school before completing his sophomore year, lived with his parents in Bolingbrook and worked intermittently as a laborer with a

cleanup crew on construction sites. Leatherman admitted being a regular user of various illegal drugs for some time before he became acquainted with John Szabo. He also admitted dealing in drugs. During a three to four month period prior to January 1979, Leatherman sold LSD to John and Christopher Rajca, whom he knew from Bolingbrook high school, on some 12 separate occasions. On cross-examination, Leatherman admitted to being arrested, together with Szabo, for the armed robbery of one Jimmy Davis.

Leatherman testified that he first met Szabo in December 1978. Leatherman was introduced to Szabo by Nick Hartley, who shared an apartment in Lemont with Leatherman's brother. During January 1979, Leatherman spent a good deal of time with Szabo, frequently getting rides in Szabo's white Gremlin. He also got drugs from Szabo.

Approximately one week before the murders, Leatherman testified, he arranged a sale of PCP (phencyclidine) to John Rajca for Szabo. Leatherman accompanied Szabo to the Rajca's house where the sale was consummated. John Rajca at that time expressed an interest in buying marijuana, which Leatherman communicated to Szabo.

Leatherman further testified that some four to five days before the murders, he rode with Szabo to a house in Romeoville, where Szabo obtained a bluish-black revolver with a short barrel from a person named "Earl." Several days later, Leatherman overheard Szabo's end of a telephone conversation between Szabo and "Earl" during which Szabo mentioned ammunition. Later that same day Leatherman saw Szabo with two bullets, which he inserted into the revolver.

According to Leatherman, on January 26, 1979, at approximately 1 p.m., Leatherman, his girlfriend, and Szabo drove to Nick Hartley's apartment. They were followed by another car containing three blacks who were interested in buying marijuana. At Hartley's apartment, Leatherman

heard Hartley and Szabo discuss selling drugs to the black men, who were waiting outside. In response to Hartley's expressed concern about dealing with blacks, Szabo pulled a gun from the front of his pants and waved it around, saying that he "could take care of them niggers."

Later in the afternoon of the 26th, Leatherman received a call from his girlfriend about a friend of hers who wanted to buy 10 pounds of marijuana. Leatherman testified that he discussed this potential deal with Szabo and had several telephone conversations with the would-be buyer, Tom Carlson. Szabo, identifying himself as "Lou," also spoke with Carlson from a pay phone at a Romeoville gas station to arrange the deal and give Carlson directions to a meeting place. According to Leatherman, Szabo said that he had not contacted the person from whom he could obtain the marijuana to sell, but told Leatherman that the two of them could hold up Carlson and take his money.

Szabo then took two bullets from the revolver he was carrying, took a pair of pliers from the Gremlin's glove compartment, and squeezed the tips of the bullets with them.

The transaction with Carlson was arranged for 4 p.m. at the Avery Gravel Pit. Leatherman testified that he and Szabo drove there and waited for a half-hour, but Carlson did not appear. Szabo and Leatherman then returned to Szabo's home in Romeoville, where Leatherman phoned Carlson. It appeared that Carlson had misunderstood Szabo's directions and had waited for him at another location. The meeting was rescheduled for 8:30 p.m. According to Leatherman, before leaving for this second meeting, Szabo brought a large kitchen knife from upstairs in his house. He covered the knife handle and the handle of the revolver with black electrical tape and gave the knife to Leatherman, who put it in his belt. As they were driving, Szabo told Leatherman that Leatherman should hold the knife, Szabo would hold the gun and they would get their money.

The parties made connections this time, but neither the deal nor the planned robbery went through. On arriving at Avery Gravel Pit at about 9 p.m., Leatherman realized that the person accompanying Tom Carlson was Pete Dixon, a friend of Leatherman's parents. Leatherman told Szabo that since he knew Dixon they could not go through with the plan. Szabo and Leatherman then told Carlson that the deal was off for that night, but that they might go through with it the following day.

On leaving the gravel pit after the meeting with Carlson and Dixon, Leatherman testified he and Szabo returned to Szabo's house, arriving about 9:30 p.m. Szabo asked Leatherman if he knew anyone else who wanted to buy marijuana. In response to Leatherman's suggestion that he would know these people also, Szabo said that they could do them in and thus avoid the problem. Leatherman then called Christopher Rajca.

After several phone calls, it was agreed that the Rajca brothers would buy three pounds of marijuana for $700. Szabo gave Christopher Rajca directions to the Avery Gravel Pit where they were to meet at 12:15 a.m.

Before setting out for their meeting with the Rajca brothers, Szabo and Leatherman drove to David Brainerd's house in Romeoville, where Szabo conversed with Brainerd for about 15 minutes. Szabo and Leatherman then returned to Szabo's house. Both used cocaine, this being the third or fourth time Leatherman had used drugs that day. Szabo took a coil of rope from the garage and put it under the passenger seat of the Gremlin.

According to Leatherman, he and Szabo left for the rendezvous with the Rajcas at about 11:45 p.m., Szabo carrying the revolver and Leatherman carrying the knife. Leatherman was wearing a brown suede jacket with a fur lining; Szabo was wearing a blue denim jacket with a fur lining. En route to the gravel pit, Szabo told Leatherman, "Just hold the knife. I'll hold the gun and I'll do them in.

If anything goes wrong, I only got two bullets and then you stab them."

The two found the Rajcas waiting for them at the gravel pit. Leatherman testified that the four young men met outside their cars but then went to the Rajcas' car. Szabo sat in the back seat behind the driver, Chris; Leatherman sat behind John. After Szabo asked about the money, John Rajca showed them some loose bills and Chris Rajca showed his billfold. On the pretense of getting the marijuana, Leatherman went to the Szabo car, took a blanket from the back seat and carried it to the Vega.

When Leatherman had resumed his seat in the car, Szabo announced a stickup and pulled his gun. Leatherman pulled his knife. Szabo then fired a shot through the drivers seat at Chris Rajca. At this John Rajca begged not to be killed and threw the loose money into the back seat. Szabo then leaned over the seat and fired one shot at John Rajca, who slumped against the half-open door of the car. Leatherman pushed the door all the way open, then got out and dragged John Rajca away from the car.

In the meantime Szabo and Chris Rajca had also gotten out of the car. Szabo told Leatherman to do Chris in with the knife. When Leatherman refused, Szabo grabbed the knife from Leatherman's hand. He lunged at Chris and stabbed him several times. As Chris was backing away from Szabo, Szabo told Leatherman to get the keys out of the Vega. Leatherman complied, also retrieving the blanket and some of the money; he threw the Vega's keys away in the direction of the gravel pit. Meanwhile, Szabo, holding the knife, was pursuing Chris Rajca towards Szabo's car. Leatherman intercepted Rajca, grabbing him by the shoulders and turning him to face Szabo. Szabo stabbed Chris again in the chest and, as Leatherman released him, in the back. Rajca staggered over to the Gremlin and leaned against it. Leatherman pushed him away from the car and towards the middle of the road where he collapsed.

Szabo and Leatherman then drove away in Szabo's car. At Szabo's direction, Leatherman threw the knife and gun out of the car window. The two drove to Szabo's house and parked the car in the yard. Using napkins, Szabo wiped some bloodstains from the car's exterior. Leatherman noticed a black-and-red ski glove inside the blanket; it had not been there originally. Szabo disposed of the glove and the napkins in the garbage can.

On entering the house, Leatherman and Szabo noticed bloodstains on their coats and Levi's. Leatherman tried to remove the blood from his jacket, first by singeing it and then by applying Crisco oil. He removed the cash from his pockets. Leatherman then used some cocaine which Szabo gave him and went to sleep. Awaking at about 8:30 a.m., Leatherman called his parents for a ride home. His father picked him up a little after 9 a.m. Leatherman returned to Szabo's house around noon on January 27, getting a ride with Bob Phillips, to pick up a concert ticket he had left there the previous night.

### ADDITIONAL EVIDENCE

The State presented testimony of additional witnesses and physical evidence which was consistent with Leatherman's account of events leading up to and following the murders. Leatherman's testimony concerning the marijuana deal with the three blacks and Szabo's brandishing a gun was corroborated by Nick Hartley. Hartley thought that the gun was a .38-caliber, blue metal, snub-nosed revolver. Hartley recalled that the incidents occurred on January 26 because it was the day before he went to a rock concert using a ticket he purchased from Leatherman. Tom Carlson's testimony corroborated Leatherman's account of the attempted marijuana transaction with Leatherman and Szabo. The testimony of Leatherman's parents corroborated his testimony in regard to his having asked permission to spend the night of January 26 at Szabo's house,

and in regard to his father's picking him up there on the morning of January 27.

Tests were performed by Robert Hunton, a firearms expert from the Bureau of Scientific Services, on a bullet taken from the body of John Rajca and on the spent projectile found at the gravel pit. In Hunton's opinion, both bullets were .38-caliber projectiles which had been fired from the same gun. One bullet also bore tool marks that had not been caused by the rifling in the gun barrel, but could have been caused by a pair of pliers.

The testimony of Dr. Edward Shalgos, a forensic pathologist who performed autopsies on the bodies of John and Chris Rajca, indicated that their deaths could have been caused in the manner described by Leatherman. The angle of penetration of the bullet, which entered John Rajca's chest at a point just above the left nipple, led Dr. Shalgos to conclude that the gun had been pointing downward from above. Dr. Shalgos' examination of Chris Rajca's body revealed that Chris Rajca had sustained a total of eight stabbing or cutting wounds. Some were so-called "defense" or "warding off" wounds. The wounds which, in Dr. Shalgos' opinion, caused Chris Rajca's death were a deep penetrating wound to the right chest that severed major blood vessels and bronchial channels; and a second penetrating wound to the back of the left chest that sliced through several organs, also causing severe bleeding. Judging by the depth and width of the wounds, Dr. Shalgos estimates that the weapon was a single-edged, sharp-pointed knife about 10 inches long and with a maximum width of 1½ inches. Dr. Shalgos testified that a person sustaining these types of wounds would be able to walk 50 or 100 feet before collapsing and dying.

Serological analyses were performed on blood stains found on Leatherman's brown suede jacket and Szabo's blue denim jacket. The jackets were recovered from a closet in John Szabo's house during the execution of a

search warrant on February 4, 1979. Muhammid Tahir, a forensic scientist with the Bureau of Scientific Services, compared the blood stains on the jackets with samples drawn from the bodies of John and Chris Rajca and from Robert Leatherman and John Szabo. Using the ABO-Rh-MN system, Tahir found the blood on both coats to be type A-Rh positive-MN. This blood type was similar to the blood of John and Chris Rajca, but dissimilar to the blood of John Szabo or Robert Leatherman.

Brian Raxall, executive director of the Serological Research Institute in California, also examined the blood stains, using electrophoresis analysis of certain enzymes and proteins found in human blood. The method, according to Raxall, is more discriminating than ABO-Rh-MN antigen analysis, that is, it distinguishes a greater number of differences between the blood types of individuals. The results of Raxall's tests led him to conclude that the blood on both jackets was that of Chris Rajca.

The white Gremlin driven by Szabo was impounded on February 3, 1979. A coil of rope was found under the passenger seat. There was also a V-shaped cut in the passenger seat; this tended to confirm Leatherman's earlier testimony that the knife he had been carrying had made.a hole in the car seat. A Will County investigator testified that the Gremlin's exterior was generally dirty, except for a "swipe mark" on the body at the left rear of the car, that looked as if someone had tried to clean it. The investigator also observed spots of a red substance on the rear of the car.

Szabo, who did not testify at the trial, presented an alibi defense through his mother, Violet Szabo. Mrs. Szabo testified that John Szabo left home with Robert Leatherman at approximately 11:30 p.m. on January 26; that Szabo returned alone shortly after midnight; and that he did not leave the house again until the next morning.

ISSUES PERTAINING TO DEFENDANT'S CONVICTIONS

Szabo's sole assignment of error with respect to the

trial concerns the denial of disclosure of summaries of oral statements made before trial by Leatherman to an assistant State's Attorney. Rule 412(a) provides that the State shall disclose to defense counsel, upon written motion, the following material within its possession or control:

"(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel." 73 Ill. 2d R. 412(a)(i).

Leatherman gave two written statements, which were provided to defense counsel. One was a statement made to Will County Investigator Lynn Jencon on February 3, 1979, the date Leatherman and Szabo were arrested, and recorded by Investigator Jencon. The other was a statement made to a polygraph operator on March 16 and 21, 1979. In addition, however, the record shows that between February and July 1979 an assistant State's Attorney conducted some 20 interviews, totaling approximately 30 hours, with Robert Leatherman. The prosecutor made "rough notes" of his conversations with Leatherman, but destroyed them after preparing an eight-page outline of Leatherman's expected testimony at trial. When defense counsel on the day of trial orally moved for disclosure of any memoranda summarizing Leatherman's oral statements in these interviews, the State's Attorney took the position that the rough notes were work product and that the State was therefore not obligated to produce them. He offered, however, to provide defense counsel with a copy of the eight-page "trial plan," or, if the circuit court so ordered, to attempt to reconstruct the notes. The circuit court, finding that further discovery was not necessary, de-

nied defendant's motion.

We note in passing that although defense counsel's motion for disclosure was made orally and not in writing as required by the Rule, the State does not argue that the issue has therefore been waived. Since the issue was presented to the circuit court in a written motion for a new trial, and in view of this court's responsibility to scrutinize the record in capital cases with especial care, we should examine the alleged error as one affecting substantial rights of the defendant, to determine whether justice has been denied. See *People v. Jones* (1982), 94 Ill. 2d 275, 294-95; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Brownell* (1980), 79 Ill. 2d 508, 542.

The State argues here, as before the circuit court, that it was not obligated to produce the assistant State's Attorney's notes of his pretrial interviews with Leatherman, because the notes are privileged work product. Indeed, Rule 412 and our cases recognize an exception to disclosure for material privileged by the work-product rule. (73 Ill. 2d R. 412(j)(i); *People v. Bassett* (1974), 56 Ill. 2d 285, 292.) The import of the rule, however, is that the determination whether memoranda summarizing a witness' oral statements consist of or contain privileged material is to be made by the court, not the prosecutor.

The committee comments to Rule 412 state:

"Paragraph (a), subparagraph (i), requires the additional production of any substantially verbatim report of an oral statement by a witness. The State is also obliged to produce a list of all memoranda reporting or summarizing oral statements *whether or not the memorandum appears to the State to be substantially verbatim reports of such statements. The defense is then entitled, upon filing of a written motion, to have the court examine the memoranda listed by the State.* If the court finds that the memoranda do contain substantially verbatim reports of witness statements, the memoranda will be disclosed to defense counsel. This additional requirement serves two purposes. *First, it ensures that the final responsibility for*

*determining what is producible rests with the court.* Second, it establishes as a matter of record, the contents of the State's file with respect to reports of witness statements and thereby facilitates appellate review of contested questions of discovery under this subsection." (Emphasis added.) Ill. Ann. Stat., ch. 110A, par. 412, Committee Comments, at 679-80 (Smith-Hurd 1976).

In *People v. Bassett* (1974), 56 Ill. 2d 285, 289-92, this court summarized the law with respect to the disclosure required of the State in criminal cases. *Bassett* approved the approach taken in the previous decisions of *People v. Sumner* (1969), 43 Ill. 2d 228, and *People v. Wolff* (1960), 19 Ill. 2d 318. These decisions make clear that, once the defendant has made a specific demand for a report of a statement, and has made a preliminary showing, by way of foundation, of the statement's pertinence to the witness' trial testimony, the court is to order the statement to be delivered directly to the defendant for his inspection and possible use in impeachment. The court is not to consider whether the prior statements would in fact be useful for impeachment; only the defense should be permitted to make that determination. (*Jencks v. United States* (1957), 353 U.S. 657, 667-69, 1 L. Ed. 2d 1103, 1111-13, 77 S. Ct. 1007, 1012-14.) When the State resists disclosure, asserting that the statement or a portion thereof is irrelevant, or contains privileged material, or is not substantially verbatim, the court must examine the statement *in camera* and determine whether it is or is not properly producible; if necessary excise irrelevant or privileged matter; and turn over to the defendant whatever portion of the statement can fairly be said to be the witness' own words.

Clearly, therefore, Szabo was entitled to have the assistant State's Attorney's notes of his interviews with Leatherman produced for *in camera* inspection by the circuit court, and to the disclosure of any unprivileged, substantially verbatim statements they contained for possible use in impeaching Leatherman's testimony. The assistant's

action in destroying the notes deprived him of that right. Szabo contends that the circuit court's ruling denying further discovery deprived him of the opportunity to effectively cross-examine Leatherman. He asserts that he was thereby denied the right of confrontation guaranteed by the sixth amendment, and denied a fair trial.

We first address the State's contention that, since it provided defense counsel with a copy of the eight-page trial plan, no further disclosure was required. The State suggests that this case is analogous to *People v. Bassett,* in which the prosecution's rough notes of interviews with witnesses were destroyed following the preparation of a number of white cards, intended for use by the State at trial. We do not think the situation in this case can be compared with that in *Bassett.* In *Bassett,* the court concluded that Rule 412 required disclosure of the white cards; the reason, however, was that they apparently contained the substance of the witnesses' pretrial statements, and were thus an adequate substitute for the original notes. (56 Ill. 2d 285, 290, 292.) Here, in contrast, the eight-page, nonverbatim outline of Leatherman's expected trial testimony clearly is not the same as contemporaneous memoranda of some 30 hours of interviews with the State's star witness.

In reviewing Szabo's claim of error, we find ourselves in a rather perplexing position. Since the interview notes, which Szabo asserts should have been disclosed, no longer exist, we cannot tell what they contained. If the notes had been preserved and were found to contain discoverable matter which could have been used to impeach Leatherman, we would then have to decide whether the denial of the opportunity to use the impeaching material in cross-examining Leatherman was prejudicial error. The improper limitation of cross-examination can, in some cases, amount to constitutional error. *People v. Wilkerson* (1981), 87 Ill. 2d 151; *Smith v. Illinois* (1968), 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748.

However, the notes were destroyed; their contents are unknown, and the effect of their nondisclosure would therefore seem impossible to assess. We do know, however, that Leatherman's testimony was central to the State's case against Szabo. Leatherman, an alleged accomplice, was also the only occurrence witness. Although strong circumstantial evidence was introduced that linked Szabo with Leatherman and with the crimes, Leatherman's testimony concerning Szabo's leading role in planning and carrying out the crimes was the only evidence tending to establish that Szabo premeditated the murders of John and Chris Rajca, and was therefore essential in proving that Szabo possessed the mental state necessary for a conviction of intentional murder. Effective cross-examination of Leatherman was thus crucial to Szabo's defense. Depending on the contents of Leatherman's pretrial statements, it is quite conceivable that their use in cross-examination would have produced a different picture of Szabo's culpability.

The State's argument that the defendant's testimony at the sentencing hearing can somehow be used retrospectively in determining whether the defendant possessed the requisite mental state necessary for his conviction at the trial for the murder of John Rajca is misplaced. While it is true that Szabo ultimately confessed to the murder of John Rajca at the sentencing hearing, the defendant made no such incriminating statement during the course of his trial. Szabo did not take the stand during the trial.

At the sentencing hearing Szabo testified that it was Leatherman who stabbed Chris Rajca to death. The testimony of Leatherman paints an entirely different picture in portraying Szabo as the murderer of both Chris and John Rajca.

The appellate court has faced the same difficulty that confronts us here in several pertinent decisions in which a defendant claimed he was denied a fair trial by the State's

failure to comply with the disclosure requirements of Rule 412, due to its intentional failure to preserve pretrial statements of witnesses. (*People v. Abbott* (1977), 55 Ill. App. 3d 21; *People v. DeStefano* (1975), 30 Ill. App. 3d 935; *People v. Manley* (1974), 19 Ill. App. 3d 365.) These cases involved the deliberate failure of the State to reduce a witness' statement to writing, as opposed to the intentional destruction of a statement after it has been written down, but we think the same principles apply to both situations. The thrust of the appellate court's holdings is that, while the discovery rules do not require the State to reduce all its witnesses' statements to writing, when the failure to preserve a statement in written form amounts to an intentional tactic to prevent disclosure of relevant material to the defendant, it will not be condoned. (*People v. Abbott* (1977), 55 Ill. App. 3d 21, 25; *People v. Manley* (1974), 19 Ill. App. 3d 365, 370.) We agree with this view.

In *People v. DeStefano* (1975), 30 Ill. App. 3d 935, the key prosecution witness, an alleged accomplice who was granted immunity in return for his testimony, was interviewed at least five times before the trial by representatives of the State. At a post-trial hearing, the State's Attorney admitted that he had ordered that no memoranda or memorialization of any of the witness' statements were to be made. The appellate court reversed defendant's murder conviction, finding that the State's deliberate failure to take written statements was for the purpose of defeating defendant's right of discovery and the use of such discovery to test the witness' credibility at trial, and under the circumstances denied defendant due process of law. 30 Ill. App. 3d 935, 943.

*People v. Manley* involved a contempt proceeding against a State's Attorney for refusal to comply with an order that certain oral, pretrial statements of witnesses in a felony case be reduced to writing and made available for discovery by the defendant. The record made clear that it

was a practice of the State's Attorney's office not to reduce substantially verbatim reports of oral statements to memoranda in order to surprise the defense at trial. In approving the circuit court's discovery order insofar as it required the reduction to writing of a specific statement—a witness' account of an admission by the defendant, which the State had indicated it intended to use at trial—the appellate court said:

> "In our view, neither the defense nor the prosecution should be allowed to avoid discovery rules by a studied practice of failing to reduce otherwise discoverable information to writing. When the trial court determines within its discretion that the reason for the failure to reduce such a statement to writing is to avoid discovery, it may properly order that the statement be reduced to writing. However, in absence of the known presence of discoverable statements, neither the State nor the defense should bear the unreasonable burden of reducing all of its investigative information to writing. The application of the discovery rules as a whole and the solutions available, including the preclusion of evidence wrongfully withheld, will sufficiently insure a fair trial." *People v. Manley* (1974), 19 Ill. App. 3d 365, 370.

In the case at bar it is undisputed that potentially discoverable memoranda of pretrial statements by the State's key witness did exist and were deliberately destroyed by the State. We are unable, on the record before us, to determine whether defendant was prejudiced by the nondisclosure of the interview notes. It may be that they contained summaries of pretrial statements by Leatherman that were entirely consistent with his trial testimony and of no value for impeachment. Or it may be that they consisted mainly of the assistant State's Attorney's mental impressions and opinions, which would be privileged from disclosure. Or it may be that they contained prior statements flatly contradicting Leatherman's trial testimony on one or more points, or possibly revealing an unsuspected motive for Leatherman's testifying as he did, or giving such varying

accounts as would have greatly discredited his testimony. We simply cannot tell what opportunities for cross-examination, if any, were denied Szabo by the nondisclosure of the notes. Consequently, we cannot say either that the nondisclosure resulted in prejudicial error, or that any error that occurred was harmless beyond a reasonable doubt. As the determination depends upon the contents of the destroyed notes, we believe the appropriate course is to vacate the convictions and remand the cause to the circuit court for entry of an order directing the State to reconstruct the written memoranda of Leatherman's pretrial statements, and to deliver them to the court for an *in camera* inspection. In the event the court finds the notes to contain discoverable, substantially verbatim statements, it should deliver them to defense counsel and order a new trial. In the event the reconstructed notes are found not to contain substantially verbatim reports of Leatherman's pretrial statements, the circuit court is directed to reinstate defendant's convictions, subject to our discussion below of defendant's superfluous murder convictions.

Szabo was charged by the indictment with four counts of murder—one count of intentional murder and one count of felony murder with respect to the killing of each victim. At the conclusion of the trial, the circuit court found him guilty on all four counts and entered judgment on all four. Szabo contends that since there were only two killings, he could be convicted of only two murders, under the rule that convictions for more than one offense cannot be carved from the same physical act. (*People v. King* (1977), 66 Ill. 2d 551, 566; *People v. Donaldson* (1982), 91 Ill. 2d 164, 170.) The State concedes, and we agree, that entry of judgment on all four convictions was erroneous. Therefore, should the circuit court reinstate defendant's convictions after remand, only two convictions for murder should be reinstated.

ISSUES PERTAINING TO THE SENTENCING HEARING

We address the issues defendant raises with regard to the sentencing hearing because of the possibility that the circuit court, after remand, may reinstate defendant's convictions. We find that errors at the sentencing hearing require that the sentence of death be vacated.

Szabo first raises several issues relating to the constitutionality of the death penalty statute that have been presented to this court in previous cases. These include the argument that the discretion vested by the statute in the prosecutor to request a death sentencing hearing results in the arbitrary and capricious imposition of the death penalty (*People v. Brownell* (1980), 79 Ill. 2d 508, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603); the argument that the statute does not provide adequate appellate review procedures (*People v. Brownell* (1980), 79 Ill. 2d 508); and the argument that the statute does not require consideration as to whether the offender can be restored to useful citizenship (*People v. Gaines* (1981), 88 Ill. 2d 342). As these issues have already been fully considered and decided by this court, further discussion of them is unnecessary here.

DISPROPORTIONALITY OF THE DEATH SENTENCE

Szabo next contends that the death penalty cannot be imposed on him because it is an excessive and disproportionate penalty in light of the fact that his accomplice, Leatherman, received a sentence of four years' imprisonment. Szabo relies primarily on *People v. Gleckler* (1980), 82 Ill. 2d 145, in which this court vacated the sentence of death and remanded for imposition of a lesser penalty. In *Gleckler*, a codefendant, Parsons, whom the court found to

be the ringleader in a double murder, had been tried separately and sentenced to life imprisonment. The court expressly rejected the contention that Gleckler was more culpable than Parsons (82 Ill. 2d 145, 166), and also found, in view of the evidence in mitigation presented by both men, that Gleckler's prospects for rehabilitation were not demonstrably poorer than Parsons' (82 Ill. 2d 145, 171.) The court found it relevant to the issue of the proportionality of Gleckler's death sentence that Parsons, a codefendant arguably more culpable and with less rehabilitative potential than Gleckler, had not received the death penalty (82 Ill. 2d 145, 167). It was also found to be relevant to the question of the appropriateness of the sentence in Gleckler's case that the death sentence of the defendant in a previous case (*People v. Walcher* (1969), 42 Ill. 2d 159), whose circumstances the court found to be similar to the circumstances in Gleckler's, had been vacated by this court as unduly severe and inappropriate. *People v. Gleckler* (1980), 82 Ill. 2d 145, 169-70.

In determining whether the imposition of the death penalty is proper in a particular case, we are required not only by the decisions of the United States Supreme Court but also by the Illinois Constitution to consider the circumstances of the offense and the character of the defendant. (Ill. Const. 1970, art. I, sec. 11 (providing that all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship); *People v. Gleckler* (1980), 82 Ill. 2d 145, 162.) A sentence does not offend the requirement of proportionality if it is commensurate with the seriousness of the crime and gives adequate consideration to the rehabilitative potential of the defendant. (*People v. Carlson* (1980), 79 Ill. 2d 564, 587; *People v. Gaines* (1981), 88 Ill. 2d 342, 380-82.) In addition, however, this court has a duty to ensure that the cases in which death is imposed are rationally distinguished from those in which it is not imposed. (*People v. Gleckler* (1980), 82 Ill. 2d 145, 166.) Ra-

tionality, consistency, and evenhandedness in the imposition of the death penalty are constitutionally indispensable. *People v. Brownell* (1980), 79 Ill. 2d 508, 543; *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958.

We conclude that the sentence of death imposed on Szabo cannot be deemed excessive or disproportionate solely because Leatherman received a lesser sentence. Szabo and Leatherman were not similarly situated. As a statutory matter, Leatherman's age precluded the imposition of the death penalty regardless of the circumstances. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b) (providing that a defendant who at the time of the commission of the offense has attained the age of 18 or more may be sentenced to death if an enumerated aggravating factor is found to exist.) Moreover, the evidence showed that Szabo had the leading role in the planning and execution of the crimes. The degree of culpability of Szabo and Leatherman was not the same. Consequently, we hold that the fact that Leatherman did not receive the death penalty for his part in the murders is not a bar to the imposition of the death penalty on Szabo.

### EXCLUSION OF JURORS AT THE SENTENCING HEARING

Szabo contends that two prospective jurors were improperly excused from the venire in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The United States Supreme Court in *Witherspoon* said:

> "[A] prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might

emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. \* \* \*

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" (Emphasis in original.) 391 U.S. 510, 522-23 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.

In addressing the exclusion of several veniremen in *People v. Gaines* (1981), 88 Ill. 2d 342, we said, "[W]e do not read *Witherspoon* as prescribing a set catechism, or as requiring a venireman to express himself with meticulous preciseness." (88 Ill. 2d 342, 356.) We recognized the need to "consider the responses of the veniremen not in isolation but as a whole." (88 Ill. 2d 342, 357.) Since the issue of guilt had been determined by the trial court, the only issue before prospective jurors in the case at bar was whether to impose the death penalty. Both the State and defendant agree that in such a situation veniremen can be excluded in compliance with *Witherspoon* only when the prospective jurors state that they would automatically vote against the death penalty without regard to the evidence produced in the case. *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522-23 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.

The State contends that the failure of defense counsel to object to the exclusion of either juror constitutes a waiver of the claim on appeal. We have held, however, that

we will consider errors not properly preserved for review where the evidence is closely balanced (*People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 283), or if the error is of such a magnitude that the accused is denied a fair and impartial trial (*People v. Manzella* (1973), 56 Ill. 2d 187, 195). We believe that the above traditional plain error rule is equally applicable to a sentencing hearing involving the death penalty, and we do not consider the improper-exclusion argument to be waived by the lack of a contemporaneous objection here. See *People v. Brownell* (1980), 79 Ill. 2d 508, 542.

The two prospective jurors that the defendant asserts were improperly excluded were veniremen by the names of Mrs. Amanda Ivezich and Mrs. Dolores Rogers. We turn first to the *voir dire* examination of Mrs. Ivezich.

After some preliminary questions the court asked Mrs. Ivezich about her feelings toward capital punishment:

"Q. Now, your Understand [*sic*], Mrs. Ivezich, that if you are one of these twelve people, you may ultimately be the one who would be the last one to say that you vote to impose the death penalty on Mr. Szabo, the defendant here. Do you understand that?

A. Yes, sir, I do.

Q. If it came to that, could you do that or do you have some reservations or could you never vote to impose the death penalty under any circumstances, whatsoever?

A. That right now, that—well, if you know—if I would know the case, right, I could.

Q. You could.

A. Yes.

Q. This is the question. If after you hear everything and you are convinced that it should be done, and could you say so and say that you would put your name on a verdict or a decision that would say put this man to death?

A. Give a minute to think. It would be a hard decision. I think I'm too soft-hearted for that.

Q. You couldn't do it if it came right down to it, you couldn't do it, is that what you are saying, because this is

what the twelve people are going to have to do.

A. I understand. I understand.

Q. And if you are on this jury, you'd be one of the twelve and you may be the very last one whose vote would decide that. Do you understand that?

Could you then do that, if you felt that it was right to do so or are you thinking that under no conditions could you take anybody's life, no matter how the evidence was, how bad it may be or anything else? That you could under no conditions vote to put somebody to death?

A. I would rather not. I would rather not.

Q. You have some doubts about whether you could do it, is that what you are saying?

A. Right. I do.

THE COURT: All right. Thank you, Mrs. Ivezich. I will excuse you for cause. Thank you very much."

Mrs. Ivezich indicated that she had some doubts about whether she would vote to sentence a person to death. Instead of excusing Mrs. Ivezich for cause at that point as the trial court did, another question should have been posed. The trial court should have then asked the prospective juror if that meant that those doubts would prevent a vote for the death penalty no matter what the evidence showed. Expressions of doubt do not amount to excusal for cause. For a venireman to express qualms about imposing the death penalty is not unexpected. *Witherspoon* requires that the venireman make it unmistakably clear that he or she could not impose the death penalty regardless of the evidence presented. Mrs. Ivezich's response that she would rather not vote to put somebody to death is not the kind of unequivocal answer that is needed as a grounds for excusal for cause under *Witherspoon.*

As the United States Supreme Court pointed out in *Witherspoon,* a man or woman who expresses serious reservations about voting to impose the death penalty is as capable of obeying the oath he or she takes as a juror as one who favors the death penalty. In rejecting the argument that those who have doubts could not be relied upon

to vote for it even if the State and instructions of the trial judge called for the death penalty, the court said:

"Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority." *Witherspoon v. Illinois* (1968), 391 U.S. 510, 520, 20 L. Ed. 2d 776, 784, 88 S. Ct. 1770, 1776.

Mrs. Ivezich, unlike the venireman in *Gaines* (where we rejected the challenge to the exclusion of four prospective jurors), never expressed any clear indication that she could not consider the death penalty. To the contrary, the only unequivocal response was that she could impose the death penalty. The more tentative answers that followed in which Mrs. Ivezich expressed reservations should not have precluded her from serving as a juror. Mrs. Ivezich was not shown to be "irrevocably committed *** to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522-23 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.) She was improperly excused.

In view of our conclusion regarding the exclusion of Mrs. Ivezich, it is not necessary to resolve whether Mrs. Rogers was improperly excused. It is clear that the improper exclusion of even a single venireman requires the vacation of a death penalty returned by a chosen jury. (*Davis v. Georgia* (1976), 429 U.S. 122, 50 L. Ed. 2d 339, 97 S. Ct. 399.) On the basis of *Witherspoon* alone the death penalty must be vacated.

### THE PROSECUTOR'S COMMENTS ON THE DEFENDANT'S POST-ARREST SILENCE

Szabo took the stand at the sentencing hearing in an effort to show that mitigating circumstances existed. In relating his version of the course of events on January 26 to 27, 1979, Szabo admitted that he had shot John Rajca, but

his testimony differed from Leatherman's account of what happened. He asserted that Leatherman did the planning, announced the stickup, and handed him the gun, and that it was Leatherman who stabbed Chris Rajca to death. Szabo went on to answer defense counsel's questions about how he now felt about what he did:

"Q. How do you feel about what you did, John?
A. Bad.
Q. How badly do you feel about it, John?
A. Can't stop thinking about it. It bothers me inside."

The State contends that this testimony of John Szabo expressing his feelings of remorse about his participation in the murders of the Rajca brothers invited the following cross-examination by the State's Attorney:

"Q. So you—that you are feeling bad did not extend to the point that you wanted to tell the police about your participation in this incident, is that correct?
A. Put it this way. I'm not a stool pigeon.
Q. You are not a stool pigeon?
A. No.
Q. You didn't tell them (the police) about how bad you felt about the Rajca brothers being killed, did you?
A. No.
Q. You didn't tell them it was Robert Leatherman's idea to start to shoot and start to rob and start to kill them?
A. No, sir.
Q. But now you say that it was his idea, is that correct?
A. Yes, sir.
Q. All of these details that you have testified to were fairly fresh in your mind one week after the incident, weren't they?
A. Yes, sir.
Q. You never bothered to tell them about it, did you?
A. No."

The State attempted to use Szabo's silence in an effort to impeach his account of the murders and his expressions of

contrition made in response to defense counsel's questions. In closing argument the State's Attorney highlighted the fact that Szabo did not offer an explanation following his arrest but chose to remain silent:

"On February 3 [the day that the defendant was interviewed by police officers at the Laraway police station] he wasn't feeling that bad that he couldn't get it off his chest. This thing was really bothering him at the time. \*\*\* [If] the facts occur[red] as he said they occurred[,] on February 3rd, 1979 [h]e would have been chomping at the bit to say, 'Hey, look, please. You know, I've had some of my problems in the past, but you have got to know something here and now[,] I was there, but Leatherman went nuts. He was absolutely crazy. Stabbing and shooting and my God, I never seen anything like it.' But what does he tell you in court? He says he's not a stoolie."

Had the cross-examination of John Szabo and subsequent closing remarks of the prosecutor occurred at trial, they would constitute error. There is no question that such remarks are fundamentally unfair and amount to a deprivation of due process in allowing an arrested person's silence to be used to impeach an explanation subsequently offered at trial. *People v. Green* (1979), 74 Ill. 2d 444, 449, 386 N.E.2d 272, 274; *Doyle v. Ohio* (1976), 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.

The State suggests that because the defendant signed a waiver of his *Miranda* rights before he indicated that he did not want to talk and wanted to see his lawyer, *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, does not apply. The State argues that Szabo spoke freely, when in fact his response to the officers' questions when being interviewed was that he was tired of the police hassling him. He then invoked his right to remain silent and his right to counsel. Szabo could not properly have been impeached at trial with what he did not say to the police officers on February 3. (*People v. Green* (1979), 74 Ill. 2d 444 (nothing that the defendant said at the time of arrest permits cross-examination on his failure to tell an exculpa-

tory story, or justifies comments by the State's Attorney during closing argument).) A prosecutor's remarks on the defendant's silence following his arrest cannot be used to impeach exculpatory testimony of a defendant at trial. *People v. Beller* (1979), 74 Ill. 2d 514.

We reiterate that because the decision to invoke the death penalty is such a serious one, the State remains obliged at the sentencing hearing to observe fundamental constitutional guarantees. (*Estelle v. Smith* (1981), 451 U.S. 454, 462, 68 L. Ed. 2d 359, 368, 101 S. Ct. 1866, 1872.) Those guarantees include the fifth amendment guarantee of the right to remain silent, and the defendant cannot be penalized for exercising that right. (See *Malloy v. Hogan* (1964), 378 U.S. 1, 8, 12 L. Ed. 2d 653, 659, 84 S. Ct. 1489, 1493-94.) This is true whether it be at trial or at the sentencing hearing.

In *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, the United States Supreme Court examined testimony of a doctor who had conducted a pretrial psychiatric examination of the defendant and subsequently testified for the State at the penalty phase of the trial to the effect that the defendant would be a danger to society. In holding that such testimony violated the defendant's privilege against compelled self-incrimination, the court said:

> "The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.' *Culombe v. Connecticut* [(1961), 367 U.S. 568, 581-82, 6 L. Ed. 2d 1037, 1046, 81 S. Ct. 1860, 1867] (opinion announcing the judgment) (emphasis added). See also *Murphy v. Waterfront [Com.* (1964), 378 U.S. 52, 55, 12 L. Ed. 2d 678, 681, 84 S. Ct. 1594, 1596-

97]; E. Griswold, The Fifth Amendment Today 7 (1955).

The Court has held that 'the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.' *In re Gault* [(1967), 387 U.S. 1, 49, 18 L. Ed. 2d 527, 558, 87 S. Ct. 1428, 1455]. In this case the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made ' "the deluded instrument of his own conviction," ' *Culombe v. Connecticut* [(1961), 367 U.S. 568, 581, 6 L. Ed. 2d 1037, 1045-46, 81 S. Ct. 1860, 1867] quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824), it protects him as well from being made the 'deluded instrument' of his own execution.

We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. See *Green v. Georgia* [(1979), 442 U.S. 95, 97, 60 L. Ed. 2d 738, 741, 99 S. Ct. 2150, 2151]; *Presnell v. Georgia* [(1978), 439 U.S. 14, 16, 58 L. Ed. 2d 207, 211, 99 S. Ct. 235, 236-37]; *Gardner v. Florida* [(1977), 430 U.S. 349, 357-58, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204] (plurality opinion)." *Estelle v. Smith* (1981), 451 U.S. 454, 462-63, 68 L. Ed. 2d 359, 368-69, 101 S. Ct. 1866, 1872-73.

It would have been fundamentally unfair to impeach Szabo at trial in the manner in which he was impeached at the sentencing hearing, and we believe it was equally unfair to cross-examine him at the sentencing hearing about his failure to make an exculpatory statement or a statement of contrition to the police officers following his arrest. While the rules governing the admission of evidence at the sentencing hearing are not the same as those that govern the admission of evidence at criminal trials (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)), fundamental constitu-

tional guarantees cannot be abrogated. The defendant's right to remain silent is one of those guarantees. The State's cross-examination and closing remarks about the defendant's silence were improper and constituted plain error at the sentencing hearing, as defects that, although not properly preserved by specific objection, clearly affected substantial rights of the defendant (see 73 Ill. 2d R. 615(a); *People v. Precup* (1978), 73 Ill. 2d 7).

### EXCLUSION OF POLYGRAPH RESULTS

While Szabo recognizes that this court has banned the use of polygraph results at a criminal trial, stipulated to or not (*People v. Baynes* (1981), 88 Ill. 2d 225), he submits that the results of the polygraph examinations taken by himself and Leatherman were sufficiently reliable to be considered at the sentencing hearing, where the rules governing the admission of evidence at criminal trials do not apply. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e)). Szabo argues that since hearsay is inadmissible at trial due to its unreliability and yet has been admitted at a death sentencing hearing, polygraph evidence should be considered equally acceptable and admissible. This argument ignores the essential dangers of polygraph evidence that are reflected in this court's decision in *Baynes*, where we held that polygraph results must be excluded from criminal trials.

Because of doubts as to the polygraph's reliability and the risk that a jury will find the polygraph results conclusive (and the polygraph will thereby usurp their function as finder of fact), we have held that results of polygraph examinations are not admissible at criminal trials. We said in *Baynes* that "[n]o other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination." We concluded therefore that "the [polygraph] evidence was wrongly admitted." *People v. Baynes* (1981), 88 Ill. 2d 225, 244-45.

The reasons we articulated in rejecting the admission of polygraph evidence at trial are also persuasive in excluding it from the sentencing jury's consideration. No evidence is as likely to divert the jurors' attention from a careful, reasoned consideration of all the aggravating and/or mitigating factors before them.

The potential that the ultimate consideration of whether a defendant lives or dies could rest in the jurors' unduly weighted view of the polygraph results leads us to the conclusion that the trial court acted properly in granting the State's motion *in limine* to exclude the results of the polygraph examinations.

### PROSECUTOR'S CLOSING REMARKS

The State's Attorney in his closing argued that society's abandonment of capital punishment has been correspondingly accompanied by a dramatic increase in the number of homicides that are being committed:

"Old fashion common sense tells you that if A kills B, in a particularly horrifying manner . . . A should pay for taking B's life with his own. Unfortunately, we have lost track of that in this country over the years. I was reading a book a while back by Frank Carrington, who is the executive director for Americans for Effective Law Enforcement.

In 1955, there were 76 executions in this nation. We had 7,000 homicides. In 1975, there were no executions in this nation. We had 20,000 homocides.

Is it any wonder that today the average citizen feels that capital punishment is necessary in order that criminals be adequately punished to insure that they do not kill some else . . . A few more statistics. Mr. Carrington pointed out in 1974, as a statistical fact, that a child born in 1974 has a statistically greater chance of being murdered on the streets of America than the chance of a combat soldier being killed in the second World War."

These remarks were calculated to play upon the jurors' emotions and were clearly improper. Apart from the fact

that the source of the statistics quoted by the prosecutor was not in evidence and could not properly be referred to in argument (*People v. Beier* (1963), 29 Ill. 2d 511, 517), the comments injected into the sentencing proceedings considerations that have no bearing on the character or record of John Szabo or the circumstances of the murders of which he was convicted. The prosecutor's reference to the supposed general deterrent effect of the death penalty could only divert the jury's attention from the aggravating and mitigating factors in Szabo's case and focus it upon an extraneous consideration. In our recent decision in *People v. Walker* (1982), 91 Ill. 2d 502, 513-17, we held improper a prosecutor's reference to the possibility that the defendant might, if sentenced to imprisonment, eventually be paroled. The statistical relationship between the number of executions and the number of homicides in the United States has no more place in the sentencing determination than the "speculative possibility" of parole did in *Walker*. 91 Ill. 2d 502, 515.

The remarks quoted above not only injected extraneous considerations into the sentencing proceeding; they were also inflammatory and prejudicial. A statement such as "a child born in 1974 has a statistically greater chance of being murdered on the streets of America than the chance of a combat soldier being killed in the second World War" inevitably provokes a strong emotional response on the part of the jury. In our decisions in *People v. Devin* (1982), 93 Ill. 2d 326, and *People v. Jones* (1982), 94 Ill. 2d 275, we discussed at length the obligation of trial court and prosecutor to avoid the introduction at the sentencing hearing of evidence, the prejudicial effect of which outweighs its relevance. (*People v. Devin* (1982), 93 Ill. 2d 326, 346-48; *People v. Jones* (1982), 94 Ill. 2d 275, 286.) We believe these considerations also apply here. The prosecutor's remarks created a grave risk that the jury would be influenced to impose the death penalty out of fear and a sense of out-

rage, not toward this particular defendant or his acts, but towards criminal defendants in general.

The second aspect of the prosecution's closing argument of which the defendant complains came during the rebuttal argument. Defense counsel in his closing argument informed the jury of the sentencing alternatives available to the trial court in the event a death sentence was not returned. He informed the jury that the defendant could be sentenced to prison for natural life, with no possibility of parole; 80 years, with possible parole in 40 years; or a minimum of 20 years under which the defendant could be eligible for parole in 10 years. He urged the jury to reject the death penalty and to allow the court to sentence the defendant to a term of imprisonment.

The State contends that the argument by defense counsel in his closing argument opened the door for the following remarks by the State's Attorney:

"I'm a little bit surprised counsel would point out the period of incarceration that we are talking about. Of course, he does for "X" number of years, according to the present law, say a person got 30 years in prison or 40 years in prison . . . It assumes one thing which you and I have very little control over. Members of the jury, in the last seven years in this state, parole eligibility has changed three times. Three times. We have gone from sentencing that existed prior to the Unified Code of Corrections where a man could be paroled in eleven years. We then . . . basically reduced it slightly and modified it and we went back to the flat time sentences. Assuming that the law does not change, the premise may be correct . . . do you really want to have the decision made whether or not John Szabo should have the opportunity to walk in society, made by some bureaucrat with very little standards, sometime down the road, where you don't even know what the law is going to be at the time? *** Members of the jury, in my opinion, justice doesn't mean a person who has been convicted of two murders should be sent to prison, cooling his heels, until some bureaucrat decides to release him."

The possible terms of parole should not have been interjected by either counsel in informing the jury of the sentencing alternatives available to the court. However, the State's Attorney could not use defense counsel's statements as a convenient springboard to suggest to the jury that a possible decision "made by some bureaucrat with very little standards" could allow Szabo to be free again some day in the future. The comments of the State's Attorney were not invited by defense counsel's reference to the court's sentencing alternatives. Such highly prejudicial remarks on the part of the prosecuting attorney inevitably diverted the jury's attention from considering the aggravating and/or mitigating factors as they properly reviewed the character and record of the defendant and the facts and circumstances surrounding the offense. See *Woodson v. North Carolina* (1976), 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65.

The role of the State's Attorney is not to speculate as to what might happen should the death penalty not be invoked. In *People v. Walker* (1982), 91 Ill. 2d 502, we vacated the penalty of death because of three errors that collectively mandated such a result. One error at the sentencing hearing in the *Walker* case was made in the prosecutor's rebuttal closing argument. The State's Attorney in *Walker* addressed the possibility of that defendant's parole eligibility and warned the jury about other "unknown" and "unnamed" victims. 91 Ill. 2d 502, 513.

We found in *Walker* that it was improper for the jury to be led to believe that whether or not the defendant would be paroled was a factor that they should consider. We said that "[i]f, in considering the individual and the offense, the jury concludes that the defendant is not such a person as should be executed, then the fact that he may eventually be paroled by the executive branch of our State govern-

ment does not mean that he should be executed to prevent that possibility. By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur." 91 Ill. 2d 502, 515.

The sentencing hearing provides an opportunity for each counsel to reason with the jury as to whether any aggravating or mitigating circumstances existed. The sentencing hearing is not intended to provide a soap box on which counsel can prey upon the fears of the jurors that the defendant may soon walk the streets again in search of another victim. See also *State v. Willie* (La. 1982), 410 So. 2d 1019 (the jury's consideration of defendant's potential for future release raised the presumption that the death penalty was imposed under the influence of an arbitrary factor unless the jury was admonished and the record indicates that the jury heeded the admonishment).

The chance that "some bureaucrat [may] decide to release" John Szabo was a factor that should not have been considered. In planting that seed in the jurors' minds the State's Attorney erred. The closing remarks of the State's Attorney in both his closing argument and rebuttal appealed to the passions and prejudices of the jury. The comments of the State's Attorney mandate the vacation of the death penalty. A penalty of death that could have been imposed under the influence of passion or prejudice cannot stand.

For the reasons stated the sentence of death is vacated. The convictions for intentional murder and felony murder are also vacated. The cause is remanded to the circuit court of Will County with directions not inconsistent with the views expressed in this opinion. If the circuit court determines that it is appropriate to reinstate the defendant's convictions, only two convictions for murders should be reinstated. If the convictions are reinstated a new sentencing

hearing is in order.

*Judgment reversed; sentence vacated;*
*cause remanded, with directions.*

JUSTICE SIMON, specially concurring:

I concur in the entire opinion except for the conclusion that it was not permissible for Szabo to introduce the results of polygraph examinations at the sentencing hearing. Fairness and justice require that a defendant in a capital case have the broadest opportunity to introduce and rely upon any evidence which may tend to show why he should escape execution.

Although I approve of the holding in *People v. Baynes* (1981), 88 Ill. 2d 225, that the results of a polygraph examination are not admissible evidence in a criminal trial, the legislature has determined that the courts should relax the rules of evidence in conducting post-conviction sentencing hearings where the prosecutor seeks the death penalty. Section 9—1(e) of the Criminal Code of 1961 provides that either the defendant or the State may present any evidence relevant to certain factors in aggravation and in mitigation at a sentencing hearing *"regardless of its admissibility under the rules governing the admission of evidence at criminal trials."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(e).) At the sentencing proceeding in the instant case the court permitted the prosecution to present both impermissible hearsay and evidence of the defendant's bad character, none of which would have been admissible as substantive evidence at a criminal trial. (See also *People v. Gleckler* (1980), 82 Ill. 2d 145, 166 (court considers testimony offered by policeman in a separate proceeding).) The accuracy and veracity of these types of evidence is no greater than the reliability of polygraph evidence. Moreover, evidence of the defendant's bad character is at least as likely as polygraph evidence to have a prejudicial and unreasonable influence on the jury. I do not understand how we can hold that a sentencing court in a

death case must exclude relevant polygraph evidence while at the same time recognizing that other types of equally questionable evidence may be admitted in such a proceeding.

The majority's treatment of the polygraph evidence is not only inconsistent with the legislature's policy, it also denies the defendant due process of law. In a proceeding that will determine whether a defendant should live or die, fundamental fairness requires that the defendant be precluded from no opportunity to present relevant evidence to show why he should live, notwithstanding the rules of evidence ordinarily applicable in criminal cases. (*Cf. Green v. Georgia* (1979), 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150 (exclusion of reliable hearsay in death penalty proceeding under State's rules of evidence violates due process).) The polygraph evidence introduced by the defendant at the sentencing hearing was at least as reliable as some of the evidence presented by the prosecution at the same hearing. Even though the reasoning in *Baynes* would prevent the use of polygraph evidence by the State at some stages of the proceedings, I feel that the defendant should be able to use it in a death penalty hearing subject to attack by the State upon its reliability.

CHIEF JUSTICE RYAN, concurring in part and dissenting in part:

I agree with the opinion of the court on the issue of the exclusion of the polygraph results at a sentencing hearing, and in that portion of the remand directions I concur. In other respects, I dissent.

It seems clear from this case that we are going to have to come to grips with the waiver – plain-error question, especially in capital cases, and formulate and adhere to some consistent position or policy. In the case now before this court a majority has applied the plain error rule and held that certain matters at the sentencing phase of the trial constituted error necessitating a rehearing, even though no

objections were made by trial counsel. I view these holdings as not consistent with the holding of this court in *People v. Free* (1983), 94 Ill. 2d 378.

I have stated my position as to the application of the plain error rule many times. (*People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Roberts* (1979), 75 Ill. 2d 1; *People v. Precup* (1978), 73 Ill. 2d 7; *People v. Green* (1979), 74 Ill. 2d 444, 453 (Ryan, J., specially concurring); *People v. Pickett* (1973), 54 Ill. 2d 280.) I need not again state the guidelines for its use in this opinion. In *People v. Carlson*, the proper application of plain error was discussed at length, following which discussion this court stated:

> "We thus construe the plain error rule to be a limited exception to the waiver doctrine." *People v. Carlson* (1980), 79 Ill. 2d 564, 577-78.

I am compelled to observe that unless this court adopts some uniform standard—unless it establishes a degree of certainty in the application of plain error—its decisions are going to be terribly confusing to the bar and to the trial courts, which must apply the law as construed by this court. Plain error should be used sparingly and according to the standards and guidelines which this court has stated in the above-cited cases. It should not be used simply to avoid or postpone the imposition of a penalty provided by law or to set aside a result we do not agree with. If we apply plain error on an *ad hoc* basis, which this court has been doing, we will be forcing our trial judges into an adversary role. They will be compelled to inject themselves into the trial of a case because they cannot know from the rulings of this court whether a statement or a question by the prosecutor, whether or not objected to, will be viewed as error by this court.

In almost every criminal appeal, different counsel represent the defendant on appeal than represented him at the trial. In such a  situation appellate counsel do not know why objections are not made at trial. Many times failure to

object is part of the defense counsel's trial strategy or the incident passes so unobtrusively as not to warrant an objection. It is not good trial practice for counsel to constantly be raising objections. Therefore, although everyone in the courtroom may be aware that a statement or question is objectionable, they may also realize that the defense counsel is willing to waive objection and therefore voices none.

The cold transcript, however, does not reflect the actual flow or feel of the trial, and appellate counsel combs the record for anything that can be construed as error, whether or not it had been called to the trial court's attention by timely objection and whether or not it was apparent to those attending the trial that counsel did not want to raise an objection. To appellate counsel's delight, no doubt, this court has willingly applied the plain error rationale to many of these unobjected-to deviations, although the failure to object may well have been intentional and possibly even a part of the trial counsel's strategy.

As an example, in the case now before us the majority has held that the failure of trial counsel to object to the court's excusing two jurors for cause on *Witherspoon* grounds did not constitute waiver of the claimed error on appeal. Although highly unlikely in this case, it is possible that defense counsel may have wanted those two jurors excused and therefore did not object to their being excused for cause by the court. Defense counsel, by not objecting, may have saved two peremptory challenges. If counsel did not have this strategy in mind and actually felt that cause for a *Witherspoon*-type excuse had not been established, a simple objection in the record would have told this court that counsel did not want to waive this claimed error.

Furthermore, the majority opinion states that, as to Mrs. Ivezich, the judge did not actually definitely establish that she would not impose the death penalty. The opinion states: "[A]nother question should have been posed." (94

Ill. 2d at 356.) If counsel would have objected, the trial court could have easily posed another question to satisfy the objection. The alleged error could have been thereby corrected at the trial level instead of being the basis for a remandment for another sentencing hearing and, no doubt, another journey through the appellate process.

Since I am discussing the *Witherspoon* issue, before considering other plain error questions in the majority opinion, I wish to also voice disagreement with the majority's view of the merits of the *Witherspoon* question involved in this case. The opinion states that Mrs. Ivezich's answers on *voir dire* did not unequivocally state that she would not impose the death penalty. Anyone who has ever conducted a *voir dire* examination knows that it is very difficult to get a juror to unequivocally commit himself to any position on a controversial subject in open court in front of the full panel of jurors and spectators. An answer such as "I don't think I could" or "It would be hard to do" is often about as unequivocal an answer as one can get from a juror. The examiner can only satisfy himself from the total examination as to whether or not a juror is committed to a certain position. The demeanor of the juror while responding to the interrogation often conveys a more precise meaning than do his answers. It is apparent from the questions asked in this case that the judge knew the *Witherspoon* test. The nature of the interrogation also shows that he was seeking to satisfy that test. It is apparent that he felt that he had. As this court stated in *People v. Gaines* (1981), 88 Ill. 2d 342, 357, we must "recognize the superior position of the trial judge to ascertain the meaning which the venireman intends to convey." Also, as noted in *Gaines*, if the defendant felt that the answers were not precise enough or that they should have been clarified, he had the right under our Rule 234 (73 Ill. 2d R. 234) to suggest to the judge additional questions.

Returning now to the waiver–plain-error question, the

majority applied plain error in other instances where the defendant's trial counsel did not object. One situation involved the cross-examination of the defendant as to his silence following arrest and the prosecutor's comment on that silence during closing argument. In neither case did defendant's trial counsel object; no motion *in limine* was made; no opportunity was given to the trial judge to prevent what the majority now views as reversible error. The opinion stresses that such a comment on defendant's silence constitutes a due process violation. However, the fact that a constitutional right is involved does not preclude the application of the waiver rule. This court has held on several occasions that the waiver rule applies to constitutional questions, as well as to other issues. (*People v. Precup* (1978), 73 Ill. 2d 7; *People v. Howell* (1975), 60 Ill. 2d 117; *People v. Pickett* (1973), 54 Ill. 2d 280; *People v. Black* (1972), 52 Ill. 2d 544; *People v. Long* (1968), 39 Ill. 2d 40.) The fact that a fifth amendment right may have been involved does not put the matter beyond the reach of the waiver rule. A trial judge does not know what is in the mind of defense counsel when he does not object. Counsel may want to use the objectionable question and its answer as a basis for future redirect examination. He may want the prosecutor to open the door for a line of interrogation he otherwise could not explore. If the trial judge were to prohibit the prosecutor from asking the question, the judge would be closing the door and would in effect be assuming the role of an advocate.

I see no reason for saying that failure to object to the alleged error does not constitute waiver here when this court has held that such a failure did constitute waiver in the several cases cited above. The holding of the majority is further evidence of the vacillation of this court on the waiver – plain-error question.

The same can be said of the majority's holding that the prosecutor's remarks were error. These remarks were to

the effect that there was an increase in the number of homicides when there were no executions. There were no objections to these remarks. I consider that any error in relation thereto was waived.

Another misapplication of plain error involves the prosecutor's comments in closing remarks concerning the possibility of parole if the defendant were to be sentenced to the penitentiary. There were no objections to these comments. The holdings of this court in the line of cases cited above would therefore seem to require, for sake of consistency, that we here hold that any error involved in the making of these remarks was waived. The opinion relies on *People v. Walker* (1982), 91 Ill. 2d 502. As noted later, I do not think that *Walker* supports the holding of the majority in this case. On the question of waiver and plain error, it offers no support whatsoever because in *Walker* the comments of the prosecutor concerning the possibility of defendant's parole *were objected to*.

In *Walker* we stated that if it were not for other matters in the record that indicated the jury was confused on the question of the possibility of parole, we would have considered the remarks by the prosecutor on that subject invited by the remarks of defense counsel. In the case now before us I find that the prosecutor's comments were clearly invited by, and were responsive to, comments that the defense counsel made in the closing arguments. In pleading with the jury to send the defendant to prison, instead of imposing the death penalty, defense counsel emphasized the number of years defendant would be confined and defense counsel himself brought up the subject of parole. The prosecutor, replying to these statements, correctly pointed out that the laws governing the number of years that the defendant would serve and the subject of parole were subject to change and in fact had been changed several times in recent years.

We cannot permit defense counsel unlimited range in fi-

nal argument to play on the jury's sympathies and emotions without any possibility of committing reversible error and at the same time require that the prosecutor's argument be so sanitized as to preclude any effective reply.

I also dissent from the majority's holding vacating the conviction and remanding the cause so that the trial court may conduct an *in camera* inspection of reconstructed memoranda of pretrial interviews with Leatherman. My first observation is that this is not a very practical solution considering that the interviews were conducted four years ago. Second, no need for such a procedure has been demonstrated.

This court has held that noncompliance with discovery requests does not require reversal absent a showing of prejudice. (*People v. Greer* (1980), 79 Ill. 2d 103, 120.) The defendant had shown no prejudice by not having been furnished the notes taken of the interview with Leatherman. The bare assertion that the defendant was effectively prevented from testing the credibility of Leatherman is not a sufficient allegation of prejudice. He does not contend that he did not have any other means of ascertaining what Leatherman had said, or that he did not know where Leatherman was, or that he did not have an opportunity to interview him. The majority opinion relies on *dicta* in *People v. Abbott* (1977), 55 Ill. App. 3d 21. However, aside from the *dicta*, the actual holding in *Abbott* does not support the conclusion reached by the majority in our case. *Abbott* found, as was true in our case, that the State had furnished a statement of the witness to the defendant and that the record did not disclose that the defendant made any attempt to interview the witness prior to trial. No memoranda of the witnesses' surveillances had been made. *Abbott* did not reverse the defendant's conviction for the prosecution's failure to provide the defense counsel with notes concerning these surveillances. The court in *Abbott* noted that a prosecutor need not reduce all of his wit-

nesses' pretrial statements to writing and *that a defense counsel should not rely on the State to prepare a case for the defense.*

There is just no substance to the defendant's contention that he has somehow been prejudiced by the prosecutor's failure to keep the notes made of Leatherman's interviews. This is just another issue which appellate counsel has discovered as the record was searched for the purpose of review. It is not contended that the notes were destroyed to prevent material unfavorable to the prosecution from falling into the hands of defendant, or that the destruction of the notes resulted from any other detrimental design.

Finally, even assuming the remandment was proper in this case, the manner in which the opinion directs it be handled is not. The opinion states that after the notes have been reconstructed and examined by the court *in camera:*

"In the event the court finds the notes to contain discoverable, substantially verbatim statements, it should deliver them to defense counsel and order a new trial." (94 Ill. 2d at 350.)

Surely the majority does not mean that a new trial should be ordered if those notes contain statements that coincided in every respect with what Leatherman had testified to at trial, or with the contents of his statements, copies of which had previously been furnished to the defendant. That would be a useless waste of judicial resources. A new trial should not be ordered unless the reconstructed notes reveal some material that would have been of some value to the defendant for cross-examination purposes. Certainly, a new trial should not be granted simply to allow the defense counsel to follow a different and hopefully more successful game plan the second time around, using the same material that was at his disposal during the first trial.

UNDERWOOD and WARD, JJ., join in this partial concurrence and partial dissent.

JUSTICE WARD, also concurring in part and dissenting in part:

The only claim of error that Szabo makes regarding his trial and the question of his guilt concerns the circuit judge's denial at the bench trial of the defendant's oral motion that the People produce notes that the People asserted were the prosecutor's work product. The majority reversed the judgment of murder and directs that in the event the court finds in an *in camera* inspection that the reconstructed notes of the prosecutor contain discoverable, substantially verbatim statements of Leatherman it shall deliver them to the defense and order a new trial to determine whether the defendant is guilty of the murder of John and Christopher Rajca. If the notes, as reconstructed, are substantially verbatim statements of Leatherman, and if they conform to Leatherman's testimony, conducting a new trial—especially as to the murder of John—will be inexplicable. The defendant testified at the hearing that he had shot John Rajca, and he obviously "possessed the mental state necessary for a conviction of intentional murder," a point which unnecessarily, I consider, concerns the majority. The defendant testified in part:

"Q. He [Leatherman] handed the weapon to you?
A. [Defendant] Pardon?
Q. He handed the gun to you?
A. Yes, sir.
Q. And what did you do at that time?
A. I leaned over to my left in the back seat, pointed the gun towards John and fired.
Q. You leaned over from the right behind the passenger's side and you shot John?
A. Yes, sir.
* * *
Q. Now, you picked on John, right; you shot John?
A. Yes.
Q. Why did you shoot him?
A. I don't know.
Q. How did you feel at the time?

A. I didn't know what to feel. Like I felt—all I could say, I felt bad.

Q. You felt bad. What happened when John got shot?

A. He started gagging.

Q. What did you do?

A. That's when—right when he started gagging, he reached—he reached down and clicked the door trying—

Q. What happened then? What happened then?

A. That's when he just fell over.

Q. He just fell over?

A. He just fell over.

Q. What did you do?

A. I pushed the door open the rest of the way, got out. Grabbed a hold of him and dragged him up by the fence."

The defendant's testimony was, of course, a judicial confession to the murder of John Rajca. (See 2 H. Underhill, Criminal Evidence sec. 385 (5th ed. 1956).) Chief Justice Ryan correctly observes that holding a new trial will be a useless waste of judicial resources.

RYAN, C.J., and UNDERWOOD, J., join in this partial concurrence and partial dissent.