People v. Mulero, No. 78932

NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

                Docket No. 78932--Agenda 1--January 1997.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARILYN MULERO,

                               Appellant.

                       Opinion filed May 22, 1997.

                                    

     JUSTICE BILANDIC delivered the opinion of the court:

     Defendant, Marilyn Mulero, was charged by indictment in Cook

County with four counts of murder (720 ILCS 5/9--1(a)(1), (a)(2)

(West 1992)), two counts of conspiracy to commit murder (720 ILCS

5/8--2, 9--1 (West 1992)) and one count of unlawful use of a

firearm by a felon (720 ILCS 5/24--1.1(a) (West 1992)), arising out

of the May 12, 1992, shooting deaths of Jimmy Cruz and Hector

Reyes. Defendant subsequently pled guilty to the four counts of

murder. The trial court accepted defendant's guilty pleas and

entered findings of guilt on all four counts of murder. Finding

that certain counts merged with others, the trial court entered

judgment on two counts of intentional murder.

     Defendant requested a jury for her capital sentencing hearing.

The jury found defendant eligible for the death penalty based upon

two statutory aggravating factors (720 ILCS 5/9--1(b)(3), (b)(11)

(West 1992)). After considering the evidence in aggravation and

mitigation, the jury found that there were no mitigating factors

sufficient to preclude imposition of the death penalty.

Accordingly, the trial judge sentenced defendant to death.

Defendant's death sentence has been stayed pending direct review by

this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603,

609(a).

     For the reasons that follow, we affirm defendant's convictions

for murder but vacate defendant's sentence of death and remand for

a new sentencing hearing.

                                   FACTS

     On May 12, 1992, Jimmy Cruz and Hector Reyes were murdered in

Humboldt Park, in Chicago, Illinois, at approximately 12:15 a.m.

Defendant, who was 21 years of age, was arrested on May 13, 1992.

On May 14, 1992, defendant gave a court-reported statement to the

police and an assistant State's Attorney. After waiving her Miranda

rights, defendant was asked about the events that occurred on May

12, 1992. In her statement, defendant indicated that she belonged

to the Maniac Latin Disciples gang. Defendant stated that on May

11, 1992, she, Jacqueline Montanez and Madeline Mendoza, who were

15 and 16 years of age respectively, decided to shoot some members

of the Latin Kings, a rival gang. The shootings were to avenge the

death of a friend named Mudo, who was killed by some Latin Kings a

couple of days earlier. Defendant stated that she obtained a small

silver automatic gun to carry out the shootings. Defendant borrowed

her brother's car and drove Montanez and Mendoza to look for some

Latin Kings. They encountered Cruz and Reyes, who were Latin Kings,

in another car. The three women and the victims all agreed to go to

Humboldt Park. Defendant stated that she intended to kill Cruz and

Reyes in the park. At the park, the group walked to the area of a

public bathroom. According to defendant, Montanez went into the

bathroom and shot Reyes, with the gun defendant had provided, while

defendant remained outside. Montanez left the bathroom and gave

defendant the gun. Defendant then shot Cruz in the back of the

head. Defendant, Montanez and Mendoza then drove away. Both victims

died of the gunshot wounds.

     On June 19, 1992, defendant was charged with the murders and

conspiracy to commit the murders. Montanez and Mendoza were also

charged with multiple counts of murder and conspiracy to commit the

murders.

     On February 26, 1993, defendant filed a motion to suppress her

May 14, 1992, statement to the police. In her motion to suppress,

defendant alleged the following: (1) she was not properly informed

of her rights pursuant to Miranda; (2) she did not understand those

rights; (3) she was not provided with an attorney after requesting

to speak with one; and (4) the police psychologically coerced her

into making a statement. At the suppression hearing, defendant

testified that, after she was arrested and asked what happened in

Humboldt Park, she told the police she did not know anything about

the murders. Defendant further testified that she confessed to the

crimes only after the police "coerced" her to do so. After

considering all the evidence presented at the suppression hearing,

the trial court denied the motion.

     On September 27, 1993, defendant entered a plea of guilty for

the murders of Jimmy Cruz and Hector Reyes. After the trial court

admonished defendant, it accepted the plea as voluntary, knowing

and intelligent. The trial court entered a judgment of guilty of

two counts of intentional murder. The case then proceeded to a

capital sentencing hearing before a jury.

     The State presented the following testimony at the eligibility

phase. John Dolan, a Chicago police detective, testified that he

was dispatched to Humboldt Park on May 12, 1992, to respond to a

report of a shooting. Once in Humboldt Park, he found Cruz and

Reyes shot to death. Detective Dolan observed Cruz lying on the

sidewalk with a .25-caliber cartridge casing lying within two feet

of his body. Reyes was lying on the floor of a restroom and a

bullet was located three feet from his head.

     Dr. Nancy Jones, a forensic pathologist and assistant medical

examiner for Cook County, testified that Jimmy Cruz, a 22-year-old

male, and Hector Reyes, a 21-year-old male, both died as a result

of gunshot wounds to the back of the head. Dr. Jones determined

that Reyes was killed by a bullet that entered the center part of

the back of his head and exited through his left eye lid. Given the

shape of the entrance wound, she opined that the muzzle of the gun

was held directly in contact with Reyes' head at the time the

bullet was fired. With respect to Cruz, Dr. Jones found that he was

killed by a bullet that entered the lower part of the back of his

head. According to Dr. Jones, the gun was probably held within one

or two inches of Cruz's head at the time it was fired.

     Ivette Rodriguez testified about events occurring before and

after the murders of Cruz and Reyes. On May 11, 1992, at about 11

or 11:30 p.m., Rodriguez saw defendant driving a white car with

Montanez and Mendoza inside the car. According to Rodriguez, they

invited her to go "make a hit with them and roll on some flakes,"

which meant to kill or fight a rival gang, namely, the Latin Kings.

She refused. Approximately 90 minutes later, Rodriguez again saw

defendant, Montanez and Mendoza in the neighborhood. Rodriguez

testified that defendant told her "we got 'em, we got 'em ... we

got the Kings." When Rodriguez called defendant a liar, Montanez

pointed to the back of her head and said "yeah we did ... I shot

him in the back of the head." Late in the evening on May 12, 1992,

Rodriguez informed the police about the murders following her

arrest for possession of a controlled substance. On May 13, 1992,

Rodriguez accompanied the police in an undercover surveillance of

a funeral home, where defendant, Montanez and Mendoza were

attending a wake for Mudo. Rodriguez identified defendant and

Montanez. The police then arrested defendant and Montanez.

     Detective Ernest Halvorsen testified about the events after

defendant's arrest. Detective Halvorsen stated that he took part in

the arrest of defendant and Montanez after Rodriguez identified

them. Mendoza was arrested two days later. After arriving at the

police station, Detective Halvorsen placed Montanez and defendant

in separate interview rooms. Following his interview with Montanez,

he gave defendant Miranda warnings. Defendant indicated that she

understood her rights and agreed to speak with him. During their

conversation, Detective Halvorsen told defendant that she was under

arrest for the murders of Cruz and Reyes, who were killed in

Humboldt Park. Initially, defendant denied knowing anything about

the murders. The detective then informed defendant that Montanez

gave a complete statement of what occurred in Humboldt Park,

including defendant's involvement. Defendant then agreed to give a

statement.

     According to Detective Halvorsen, defendant told him that she

was a member of the Maniac Latin Disciples street gang. Defendant,

Montanez and Mendoza had talked about obtaining revenge against the

Latin Kings for murdering their friend Mudo. They decided to "go on

a mission ... and shoot some Kings." Defendant obtained a small

silver automatic pistol and borrowed a white car from her brother.

Defendant, along with Montanez and Mendoza, then drove over to the

Latin Kings neighborhood for the purpose of shooting any Latin King

they saw on the street. As they were driving, a car pulled

alongside of them that contained two men, Cruz and Reyes. Defendant

informed Detective Halvorsen that Montanez told her the two men

were "flakes," that is, Latin Kings. Defendant, Montanez and

Mendoza invited Cruz and Reyes to "party" in Humboldt Park.

Defendant told Detective Halvorsen that they knew they were going

to kill Cruz and Reyes when they arrived at the park. Once in the

park, Montanez walked into a bathroom with Reyes and shot him in

the back of the head. Montanez then handed the gun to defendant.

Defendant walked up behind Cruz and shot him in the back of the

head. The three girls then went back to their neighborhood.

Detective Halvorsen described defendant's demeanor at the time of

her statement as arrogant and cocky. According to Detective

Halvorsen, defendant was proud of herself because she had performed

a mission for her "nation." In Detective Halvorsen's opinion,

defendant did not appear remorseful during her conversations with

him.

     John Dillon, an assistant State's Attorney for Cook County,

testified that when he arrived at the police station on May 14,

1992, he first spoke with Montanez, who gave a court-reported

statement. Next, Assistant State's Attorney Dillon spoke with

defendant after advising her of Miranda warnings, which she claimed

to understand and waived. Defendant agreed to give a court-reported

statement. During defendant's oral statement, she indicated that

there was a celebration after the murders. Assistant State's

Attorney Dillon stated that defendant's demeanor during their

conversation was very calm. Defendant was in control of herself and

did not indicate any remorse for her actions. It appeared to

Assistant State's Attorney Dillon that defendant was very proud of

what she had done.

     The State concluded its case at the eligibility phase by

presenting evidence by stipulation. It was stipulated that James

Tracy, a firearms examiner with the Chicago police department crime

laboratory, would testify that the bullet taken from Cruz's body

and the bullet found next to Reyes' body were .25-caliber bullets,

and that the cartridge casing found near Cruz's body was a .25-

caliber cartridge. Also admitted into evidence was a certified copy

of defendant's indictment and conviction following her guilty plea.

The State then rested. The defense presented no evidence at the

eligibility phase.

     After considering the evidence, the jury found beyond a

reasonable doubt that defendant was eligible for the death penalty

under the following aggravating factors: (1) the murder was

committed in a cold, calculated, and premeditated manner pursuant

to a preconceived plan (720 ILCS 5/9--1(b)(11) (West 1992)) and (2)

defendant had been convicted of murdering two or more persons (720

ILCS 5/9--1(b)(3) (West 1992)).

     In the second phase of the sentencing hearing, the State

presented the following evidence in aggravation. David Lavin and

Sandra Stavropoulos, Cook County assistant State's Attorneys,

testified regarding their previous prosecutions of defendant. Lavin

stated that defendant pled guilty on March 28, 1990, to two charges

of delivery of a controlled substance. Defendant received two

years' probation and served 30 days in the county jail. On March 2,

1991, while on probation, defendant was arrested for selling

cocaine to an undercover officer. Stavropoulos stated that on July

1, 1991, defendant pled guilty to delivery of a controlled

substance and received a three-year prison term. Defendant was

paroled on February 28, 1992.

     Joanne Roberts testified for the State about her encounters

with defendant in jail. On March 27, 1993, Roberts had been

arrested for armed robbery. While Roberts was in Cook County jail,

she met defendant, whom she knew was a Maniac Latin Disciple.

Roberts stated that in June of 1993, while in jail together,

defendant asked her to kill Jackie Montanez because she was going

to testify against her. When Roberts refused, defendant informed

her that "she would take care of it herself." After relaying this

information to the prosecutors, Roberts was released from jail and

placed on an electronic home monitoring system for her own safety.

According to Roberts, no promises were made to her regarding her

pending charges in exchange for her testimony. Roberts then

testified about threatening phone calls she received from defendant

and an unknown male member of the Maniac Latin Disciples prior to

her testimony at this sentencing hearing.

     Finally, Anthony Riccio, a detective for the Chicago police

department, who at the time of the murder was assigned to the gang

crimes unit and was familiar with the street gangs in the Humboldt

Park area, testified for the State. Detective Riccio explained a

news videotape taken of defendant after she confessed to the

murders. Detective Riccio testified that as he escorted defendant

through the police station after her confession, television news

cameras captured her shouting gang slogans and flashing gang

signals with her hands. As the videotape was played to the jury,

Detective Riccio explained that defendant took her hand and placed

it over her heart, which meant that what she was about to say and

do was "from her heart." Next, defendant's hand was shown pointing

five fingers downward, which represented a disrespectful gesture to

the Latin Kings. Defendant then flipped her hand in an upright

position, like a pitchfork, to show her allegiance to the Maniac

Latin Disciples. Defendant also stated "KK," which Detective Riccio

stated meant "king killers" and was a form of disrespect to the

Latin Kings.

     Following Detective Riccio's testimony, the State concluded

the aggravation portion of the sentencing hearing. Defendant

presented the following evidence in mitigation. Four individuals

who testified on behalf of defendant were persons she had

encountered while in Cook County jail. Joseph Widdington, a teacher

in the PACE program (Program Active for Correctional Education),

testified that defendant was a tutor in this program. Widdington

described defendant as a quiet person who wrote poetry. In

Widdington's opinion, defendant was the type of person who had

talent but never used it. Gloria Brookins, a social worker and

counselor for the PACE program, testified that defendant helped her

with other women with respect to peer tutoring, organizing socials

and monthly activities. Brookins stated that she never saw

defendant threaten anyone in the program. Rather, defendant was

friendly and well-liked. Sergeant Sharon Smith, a correctional

officer in Cook County jail, stated that defendant was a quiet,

nice, respectful, and affable person. She never witnessed defendant

engage in gang-related behavior. According to Sergeant Smith,

defendant had an easygoing disposition and a positive attitude.

Martin Lowery, another correctional officer, testified that there

were no threats or disturbances between defendant and Montanez.

     Defendant's mother, Angelina Gonzalez, also testified on

behalf of defendant. Mrs. Gonzalez stated that she brought

defendant's two children to visit her in jail every week. According

to Mrs. Gonzalez, defendant behaved well with her children and

frequently called to ask about them.

     Defendant herself testified in the mitigation stage of the

sentencing hearing. Defendant stated that she was a former member

of the Maniac Latin Disciples. Defendant recounted that in 1992 she

did not hate the Latin Kings because she never had any problems

with them. Defendant testified, however, that she became angry

about the murder of Mudo, a deaf mute from her neighborhood.

Defendant stated that because of Mudo's death she agreed to join

Jackie Montanez and Madeline Mendoza to kill some Latin Kings.

According to defendant, Montanez obtained a .25-caliber automatic

gun, while defendant borrowed her brother's car and drove Montanez

and Mendoza to look for some Latin Kings. They eventually

encountered Jimmy Cruz and Hector Reyes, who asked the girls to

meet them in Humboldt Park. Montanez informed defendant that Cruz

and Reyes were Latin Kings. Defendant stated that, although she

knew Montanez had a loaded gun, she did not know that Montanez

would shoot Reyes. After Reyes' shooting, Montanez handed defendant

the gun and she placed the gun approximately five inches away from

Cruz's head and shot him. According to defendant, she began to cry

after she shot Cruz. Defendant then admitted going back to the

neighborhood along with Montanez and Mendoza and bragging to Ivette

Rodriguez about what they had just done.

     During defendant's testimony, she also admitted knowing Joanne

Roberts in Cook County jail. According to defendant, however, she

had little conversation with Roberts. Defendant denied asking

Roberts to have Montanez killed. Defendant refuted Roberts'

allegation that she was mad at Montanez. Defendant also

acknowledged that she obtained Roberts' telephone number from

Roberts, who gave it to her so they could keep in touch. Defendant

stated that she called Roberts once and asked her how she was doing

and how she was able to go on an electric home monitoring system.

Roberts informed defendant that the State made a deal with her in

exchange for her turning State's evidence against Mendoza.

     Additional facts are discussed where relevant in the analysis

portion of the opinion.

     After considering the evidence in aggravation and mitigation,

the jury unanimously found that there were no mitigating factors

sufficient to preclude a sentence of death. The trial court

accordingly sentenced defendant to death.

     Defendant subsequently filed post-sentencing motions. After a

hearing, defendant's motion for a new sentencing hearing was

denied. Defendant then filed a pro se petition to withdraw her

guilty plea and vacate her sentence, and a pro se motion for

modification of sentence. Defense counsel later filed a

supplemental motion for a new sentencing hearing, and a

supplemental petition to withdraw defendant's guilty plea and

vacate her sentence. The court refused to accept the filing of the

new sentencing hearing motion. With respect to the supplemental

petition to withdraw defendant's guilty plea and vacate her

sentence, the court confined the evidence to whether defendant's

guilty plea had been knowing, intelligent and voluntary. After a

hearing, the court denied the motion to withdraw defendant's guilty

plea. This appeal followed.

                                 ANALYSIS

     Defendant raises the following issues on appeal: (1) whether

the prosecutor's questions during cross-examination and remarks

during closing arguments at the sentencing hearing concerning

defendant's filing of a pretrial motion to suppress her confession

deprived defendant of her right against self-incrimination and to

due process of law; (2) whether the trial court erred in admitting

as evidence in aggravation the testimony of Joanne Roberts

regarding death threats made to her by an unknown man; (3) whether

the trial court erred in refusing to allow the defense to bring

defendant's two young children before the jury for them to view

during the presentation of mitigating evidence; (4) whether

defendant's death sentence must be vacated because of the

prosecutor's remarks during closing arguments at the sentencing

hearing; (5) whether the trial court erred in ruling that the

testimony of the defense's clinical psychologist at the post-

sentencing hearing was not credible; (6) whether the trial court

erred in allowing defendant only 10 peremptory challenges in

selecting the sentencing jury; (7) whether section 9--1(b)(11) of

the Criminal Code of 1961 is an unconstitutional eligibility

factor; and (8) whether the Illinois death penalty statute is

unconstitutional. For the reasons stated below, we vacate

defendant's death sentence and remand for a new sentencing hearing.

                           I. SENTENCING ISSUES

              A. Reference to Defendant's Motion to Suppress

     Defendant argues that she was deprived of due process of law

and her fifth amendment right against self-incrimination at the

aggravation/mitigation stage of her capital sentencing hearing.

Defendant claims that the prosecutor improperly cross-examined

defendant by questioning her about her pretrial motion to suppress

her confession and its subsequent denial. Defendant also contends

that the prosecutor made improper comments during closing arguments

about the motion to suppress. We agree that the prosecutor's use of

defendant's motion to suppress at the sentencing hearing was

improper and prejudicial and entitles defendant to a new sentencing

hearing.

     As noted, defendant filed a pretrial motion to suppress her

confession on the bases that she was not timely given Miranda

warnings and was coerced by the police into making a statement. The

trial court denied the motion to suppress, after which defendant

entered a plea of guilty. At the second phase of the sentencing

hearing, defendant's theory of mitigation was that she entered her

plea of guilty because of remorse. Defendant testified in

mitigation that she pled guilty because she knew her actions were

wrong and she wanted to ease her conscience. On cross-examination,

the prosecutor asked defendant if she knew the meaning of the word

remorse and if she had ever felt remorse about this case. Defendant

responded that feeling remorse meant "feeling sorry," and that she

had felt remorse ever since the murders happened. Defendant also

stated that she had cooperated with the police and told the truth

since the murders happened. The prosecutor then confronted

defendant with her testimony from the pretrial suppression hearing,

at which defendant admitted initially telling the police that she

did not know what happened in Humboldt Park. The prosecutor

continued his cross-examination of defendant as follows:

               "Q. [Assistant State's Attorney:] When did you first

          decide that you were going to plead guilty on this case?

               A. Months ago, before Jackie came to trial.

               Q. Pardon me?

               A. Months ago before Jackie started her trial.

               Q. Well, about what month in particular did you

          first start thinking you were going to plead guilty here?

               A. Around June or July.

               Q. June or July. Well, was it before--do we have--

          was it before you had the pretrial hearing with Judge

          Mannion?

               A. After the pretrial hearing.

               Q. After. That's because in that hearing before

          Judge Mannion, you know, when you had all this remorse in

          your heart and everything else, you tried to get the

          Judge to throw out your confession, isn't that correct?

               A. No.

               MR. LYNCH [defense attorney:] Objection. Judge, may

          I have a sidebar?

               THE COURT: Overruled.

                                   * * *

               Q. [Assistant State's Attorney:] Miss Mulero, you

          testified that you decided or you were starting to think

          about pleading guilty sometime in June of 1993, isn't

          that correct?

               A. Yes.

               Q. And also coincidentally right around that time,

          there was a hearing on a motion that you and your

          attorney filed to have your confession thrown out of

          court, isn't that correct?

               A. Yes.

               Q. And in fact showing you what is People's Exhibit

          Number 51, here's a copy of a motion that was filed on

          your behalf, isn't that correct?

               A. Yes.

               Q. And in facts [sic] in June of 1993, you stood and

          took an oath before the clerk saying that all the

          allegations in that motion were correct, isn't that

          right?

               A. Yes.

               Q. And in this motion, you said basically that you

          didn't get your rights read to you, is that correct?

               A. Yes.

               Q. And you also said basically that the police

          tricked you into confessing, isn't that correct?

               A. In some way, yes.

               Q. And there was a hearing on that matter, and your

          motion was thrown out of court, isn't that correct?

               A. I don't know.

               Q. Well, you know then that your confession would be

          admissible in your case if you went to trial, isn't that

          correct?

               A. What [do] you mean by admissible?

               Q. Well, you knew that the People of the State of

          Illinois could use that confession that you have in front

          of you if you went to trial, isn't that correct?

               A. Yes.

               Q. And you found that out in June of 1993, isn't

          that correct?

               A. Yes.

               Q. Right around the time you start[ed] thinking

          about pleading guilty, isn't that correct?

               A. Yes."

     The prosecutor also referred to defendant's failed suppression

motion during closing and rebuttal arguments at the

aggravation/mitigation phase. The prosecutor characterized the

motion to suppress as a "legal maneuver" and argued that it

demonstrated defendant's lack of remorse. More specifically, the

prosecutor made the following remarks to the jury at the sentencing

hearing:

               "If she wanted to plead guilty, she could have come

          in court. And you saw the indictment when she was

          indicted back in the spring of 1992. She could have come

          to court and pled guilty. But no, she tried some legal

          maneuver to try to get her confession thrown out of

          court. That didn't work, she saw what happened to her co-

          defendants, that didn't work. You figure out why she pled

          guilty. She is cutting her losses. What else is she going

          to do. Is that mitigation.

                                   * * *

               And what are the facts of the guilty plea. The

          guilty plea is an out and out sham and we know it. She is

          trying to maneuver her way through the legal system to

          tell you she is remorseful. You saw her up on the stand

          when she took the stand. Was she remorseful or was she

          trying to figure out a way how to get out of this mess

          she's got herself into. She is trying to beat this case

          absolutely one hundred percent. She is like a trapped rat

          in a corner that has no way out.

               And how do we know that. We know that because at the

          time she decides to become remorseful two months ago, she

          is trying to get the statement thrown out saying the

          police tricked her, they tricked her. I didn't confess,

          but yet she tells you I was remorseful. I'm sorry you

          can't have it both ways, folks.

               Mr. Gamboney [Assistant State's Attorney]

          specifically asked her, you supported the contents of

          this motion and she swore that the police tried to trick

          her, and that's why she confessed, not because she was

          remorseful."

     It is well settled that a defendant's remorse or lack thereof

is a proper subject for consideration at sentencing. See People v.

Barrow, 133 Ill. 2d 226, 281 (1989); People v. Neal, 111 Ill. 2d

180, 196 (1985). When inquiring into a defendant's remorse,

however, the State may not violate a defendant's constitutional

rights. See People v. Szabo, 94 Ill. 2d 327, 360 (1983). Defendant

contends that the State's questions and comments here improperly

used defendant's exercise of her constitutional rights against her.

See Griffin v. California, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S.

Ct. 1229 (1965); Szabo, 94 Ill. 2d 327. Both the United States

Supreme Court and this court have held that comments about a

defendant's exercise of a constitutional right are improper because

they penalize a defendant for exercising his or her right. See

Griffin, 380 U.S. at 614, 14 L. Ed. 2d at 109-10, 85 S. Ct. at

1232-33; Szabo, 94 Ill. 2d at 360. Such comments have a chilling

effect on a defendant's exercise of his or her constitutional right

by making assertion of a particular right costly. See Griffin, 380

U.S. at 614, 14 L. Ed. 2d at 110, 85 S. Ct. at 1233.

     These principles were clearly violated by the prosecutor's

questions and comments in this case. During both the cross-

examination of defendant and the closing arguments, the prosecutor

used defendant's mere filing of the motion to suppress against her

in an effort to demonstrate defendant's lack of remorse. The

State's use of defendant's motion to suppress in this manner was

wholly improper and unquestionably prejudicial.

     Undeniably, defendant had a constitutional right to remain

silent. U.S. Const., amend. V. In filing the motion to suppress,

defendant argued that her fifth amendment right to remain silent

had been violated and the motion attempted to vindicate that right.

Regardless of whether the motion was successful, defendant

nevertheless had the right to challenge her confession on this

basis. In using defendant's motion to suppress against her, the

prosecutor essentially used defendant's exercise of a

constitutional right against her. The sentencing jury was in effect

told that it could consider defendant's exercise of her

constitutional right to remain silent as an aggravating factor

against her. The exercise of a constitutional right may not be

turned into a sword to be used against a defendant in this manner.

The "chilling effect" on a defendant's decision to exercise a

constitutional right in circumstances such as those in this case is

obvious. This court has condemned a similar practice by the State

in People v. Szabo, 94 Ill. 2d 327 (1983).

     In Szabo, the defendant chose to remain silent following his

arrest. The defendant testified in mitigation at the

aggravation/mitigation phase of his capital sentencing hearing that

he felt badly about the murders. In response to his mitigation

testimony, the prosecutor cross-examined the defendant about his

failure to make a statement showing remorse to the police at the

time of his arrest. During closing arguments at sentencing, the

prosecutor argued that the defendant was not truly remorseful

because he had not offered an explanation or statement of

contrition following his arrest but chose to remain silent. This

court found the prosecutor's questioning and argument constituted

plain error. The prosecutor's comments used the defendant's silence

to impeach his testimony at sentencing and thereby penalized the

defendant for exercising his constitutional right to remain silent.

Szabo, 94 Ill. 2d at 359-61. Such actions by the prosecutor were

held to be fundamentally unfair and to require a new sentencing

hearing. Szabo, 94 Ill. 2d at 362, 367-68.

     The State's comments in this case are equally as egregious as

those found to require reversal in Szabo. In both cases, the

defendant was penalized for exercising a constitutional right.

While the defendant in Szabo directly exercised the right to remain

silent, defendant here indirectly exercised her fifth amendment

right to remain silent by attempting to enforce that right in her

motion to suppress. As in Szabo, we find the prosecutor's questions

and remarks regarding defendant's exercise of a constitutional

right in this case to be fundamentally unfair and to require that

defendant's death sentence be vacated.

     The State responds that its questions on cross-examination

were proper because it was simply attempting to impeach defendant's

credibility regarding her guilty plea with her prior inconsistent

testimony at the suppression hearing. See People v. Hudson, 157

Ill. 2d 401, 435 (1993) (any permissible kind of impeaching matter

may be developed on cross-examination to test the credibility of a

witness). According to the State, it was attempting to impeach

defendant's mitigation testimony, that remorse was the motive for

her guilty plea, with her prior inconsistent statements from the

suppression hearing. We agree with the State's argument only to the

extent that it was proper to impeach defendant with her prior

inconsistent testimony from the suppression hearing.

     A defendant's constitutional rights are not violated when a

defendant is cross-examined as to a prior inconsistent statement.

See Anderson v. Charles, 447 U.S. 404, 408-09, 65 L. Ed. 2d 222,

226-27, 100 S. Ct. 2180, 2182 (1980); People v. Adams, 109 Ill. 2d

102, 119-20 (1985). It is also well established that a defendant's

testimony in conjunction with his or her motion to suppress

evidence can be used to impeach a defendant's testimony at trial.

See People v. Sturgis, 58 Ill. 2d 211, 216 (1974). We adhere to

these principles. Here, however, the State exceeded the bounds of

simply impeaching defendant with prior inconsistent testimony.

Rather, the State used defendant's actual motion to suppress

against her by suggesting that its mere filing was itself evidence

of a lack of remorse on the part of defendant. A defendant's

exercise of a constitutional right is not permissible impeachment

evidence. See Doyle v. Ohio, 426 U.S. 610, 619, 49 L. Ed. 2d 91,

98, 96 S. Ct. 2240, 2245 (1976) (violation of due process when

defendant's silence following Miranda warnings is used to impeach

an explanation subsequently offered at trial).

     Moreover, the mere filing of the motion to suppress her

confession did not contradict defendant's claim that remorse was

the motive behind her guilty plea. The motion to suppress had no

correlation to defendant's remorse. Defense counsel employed the

motion to suppress to address an issue of law, namely, the

admissibility of defendant's confession as evidence. Consequently,

the prosecutor, in arguing the motion to suppress, introduced

evidence that neither involved an inconsistent statement nor was

relevant for impeachment purposes. See Hudson, 157 Ill. 2d at 449.

As such, the prosecutor here did not merely "utilize the

traditional truth-testing devices of the adversary process." Harris

v. New York, 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643,

645-46 (1971). We therefore reject the State's claim that the

filing of the motion to suppress was properly used to impeach

defendant's testimony. Under these circumstances, we find that the

trial court abused its discretion in allowing cross-examination as

to defendant's filing of a motion to suppress. See Hudson, 157 Ill.

2d at 435; People v. Peeples, 155 Ill. 2d 422, 492 (1993).

     With regard to the prosecutor's comments during closing

argument, the State first contends that any challenge to those

comments has been waived because defendant neither objected to them

at trial nor included them in her post-sentencing motion. See

People v. Enoch, 122 Ill. 2d 176 (1988). As in Szabo, however, we

find that fundamental fairness requires that the strict waiver rule

be relaxed in this case and that the prosecutor's closing arguments

be recognized as plain error affecting defendant's substantial

rights. See Szabo, 94 Ill. 2d at 362; People v. Green, 74 Ill. 2d

444, 450 (1979).

     Aside from its waiver argument, the State claims that these

comments were proper because the prosecutor merely challenged

defendant's proclaimed motives for pleading guilty and highlighted

evidence showing defendant was not remorseful. In support of its

position, the State refers to the general rule that challenging the

credibility of a defendant and his or her theory of defense is

proper in closing argument when there is evidence justifying the

challenge. See Hudson, 157 Ill. 2d at 444. Here, according to the

State, its challenge to defendant's claim of remorse was justified

given defendant's testimony during the suppression hearing. We do

not dispute that the prosecutor was permitted to challenge

defendant's credibility regarding her motive for pleading guilty by

commenting on defendant's apparent lack of remorse as evidenced by

her testimony at the suppression hearing. The prosecutor, however,

went far beyond that permissible commentary to suggest that

defendant's exercise of a constitutional right be used as

aggravation evidence against her. The prosecutor's comments were

clearly intended to direct the jury's attention to defendant's

attempt to enforce her right to silence. See People v. Franklin,

135 Ill. 2d 78, 101 (1990); People v. Burton, 44 Ill. 2d 53, 55-57

(1969). This improper commentary on defendant's exercise of a

constitutional right resulted in substantial prejudice to defendant

at the sentencing hearing by casting defendant's assertion of her

right in an unfavorable light to the jury.

     Based on the foregoing analysis, we hold that defendant's

filing of a motion to suppress was irrelevant both substantively

and for impeachment purposes at the sentencing hearing. The

prosecutor improperly used defendant's constitutional right to

silence against her by introducing into evidence her motion to

suppress, which was intended to enforce that right. Defendant was

prejudiced by the prosecutor's actions and deprived of a fair

capital sentencing hearing because the sentencing jury was

permitted to rely on improper evidence and comments. Accordingly,

we vacate defendant's death sentence and remand for a new

sentencing hearing.

     Defendant also raises other challenges to her capital

sentencing hearing and to the constitutionality of the Illinois

death penalty statute. Because we have concluded that defendant is

entitled to a new sentencing hearing, we address only those alleged

errors which are likely to arise again on remand. See People v.

Simms, 143 Ill. 2d 154, 173 (1991).

                             B. Jury Selection

     Defendant contends that she was denied a fair capital

sentencing hearing because the trial court allowed each side only

10 peremptory challenges.

     The record reveals that, after defendant requested a jury for

the sentencing hearing, the prosecutor informed the trial judge

that he thought each side should receive 10 peremptory challenges.

The trial judge accepted this representation by the prosecutor and

allowed each side 10 peremptory challenges. Defense counsel did not

object to the number of peremptory challenges allotted. During the

jury selection, defendant used nine peremptory challenges before

agreeing on a 12-member jury. Defendant subsequently utilized her

last peremptory challenge to exclude one of the two alternate

jurors. Defendant now claims that she was entitled to 14 peremptory

challenges pursuant to Supreme Court Rule 434(d) (134 Ill. 2d R.

434(d)). Defendant further claims that the trial court committed

reversible error in allowing her only 10 peremptory challenges. As

a result, defendant asserts that her sentence of death should be

vacated and the cause remanded for the proper selection of a

sentencing jury.

     The State concedes that the trial court erred in allotting

defendant only 10 peremptory challenges. We agree. Supreme Court

Rule 434(d) provides, in pertinent part, that "[a] defendant tried

alone shall be allowed 14 peremptory challenges in a capital case."

134 Ill. 2d R. 434(d). It is thus clear that the trial court erred

in this case by allowing defendant only 10 peremptory challenges.

See People v. Daniels, 172 Ill. 2d 154 (1996). On remand, defendant

should be allowed the proper number of peremptory challenges.

Because we have already determined that defendant is entitled to a

new sentencing hearing on another ground, we need not address

whether the trial court's actions as to the number of peremptory

challenges amounted to reversible error.

                              C. Eligibility

     Defendant claims that her death sentence must be vacated

because the jury found her eligible on the basis of an

unconstitutionally vague eligibility factor. As set forth in the

facts, the sentencing jury found defendant eligible for death on

the basis of two eligibility factors: (1) murder of two or more

persons (720 ILCS 9--1(b)(3) (West 1992)), and (2) murder committed

in a cold, calculated and premeditated manner pursuant to a

preconceived plan (720 ILCS 5/9--1(b)(11) (West 1992)). Defendant

now challenges the constitutionality of section 9--1(b)(11),

arguing that its terms are vague such that a limiting construction

should be applied to this factor. Defendant also alleges that

section 9--1(b)(11) is unconstitutional because its terms do not

narrow the class of individuals eligible for the death penalty.

     This court has previously rejected identical challenges to the

constitutionality of section 9--1(b)(11). We have held that section

9--1(b)(11)'s terms are not unconstitutionally vague because they

provide sufficient guidelines for the sentencer in determining

death eligibility. See People v. Williams, 173 Ill. 2d 48, 89-90

(1996); People v. Johnson, 154 Ill. 2d 356, 372-73 (1993).

Consequently, the need for a limiting instruction has been

rejected. In addition, we have held that the terms of section 9--

1(b)(11) sufficiently narrow the class of eligible defendants by

placing the necessary restraint on the sentencer's discretion to

impose death. See People v. Munson, 171 Ill. 2d 158, 191 (1996). We

are not persuaded that we should reconsider these holdings.

Therefore, we adhere to our prior decisions that section 9--

1(b)(11) is constitutionally valid.

                              D. Aggravation

     Defendant contends that the trial court erred in allowing the

State's witness Joanne Roberts to testify during the

aggravation/mitigation phase of the sentencing hearing that she

received death threats over the telephone from an unknown male, who

warned her not to testify against defendant.

     Joanne Roberts testified that she had met defendant while both

were incarcerated in Cook County jail. Roberts knew that defendant

was a member of the Maniac Latin Disciples street gang. Roberts

testified that in June of 1993 she and defendant had a conversation

in which defendant stated that her codefendant, Jackie Montanez,

was going to "turn states on her." Roberts claimed that defendant

then asked her to kill Montanez. Roberts refused and defendant

replied that "she would take care of it herself." Roberts

subsequently reported her conversation with defendant to

prosecutors. On July 29, 1993, Roberts was released from jail and

placed on an electronic home monitoring system for her own safety.

Roberts testified that in August of 1993, shortly after her release

and while at home, she received a phone call from defendant in

which defendant asked her why she had turned against her, and told

Roberts that she "would be dealt with later on for that." Roberts

further testified that she received another phone call about a week

prior to her testimony at defendant's death penalty hearing in

November of 1993, which she described in the following manner:

               "Q. [Assistant State's Attorney:] Directing your

          attention to approximately last week, did you have

          occasion again to be contacted by someone from the

          Disciples?

               A. Yes, I did.

               Q. And did that person identify himself?

               A. He called me from the penitentiary and he said he

          was--he was one of the--one of the, what do you call

          them, was one of the ones that call shots over there.

               And he said that he was going to have me killed for

          turning states on them for telling them--for telling on

          them. And he just went on and on and on.

               MR. LYNCH [defense attorney]: Judge, may I have a

          sidebar?"

Defense counsel objected that evidence of this threat was

inadmissible because there was no connection established between it

and defendant. The trial court overruled the objection because

defendant's connection to this threat was "a reasonable inference

to be drawn from the previous conversations." Roberts then resumed

her testimony regarding the phone call:

               "Q. Can you tell the ladies and gentlemen of the

          jury at that time what he said to you?

               A. He said that he was--he was one of the chiefs

          from the Disciples and that if I testified against Muneca

          [defendant], that he was going to have me killed. And he

          knew that [sic] where I lived and everything.

               And he was just going on and on with the same thing.

          And I just hung up on him.

               Q. Now, during your time in Cook County Jail, did

          you have occasion to learn whether or not Marilyn Mulero

          had any rank with her gang inside the jail?

               A. Yes, she did.

               Q. And what was her rank?

               A. She was calling it for the second floor. She had

          the second floor."

     Defendant argues that Roberts' testimony regarding a threat by

an unknown male was inadmissible. According to defendant, the

evidence was neither relevant nor reliable because the State failed

to establish a connection between defendant and the third party's

threat. In support of her argument, defendant points out that the

evidence failed to show that she had ordered this phone call, or

that she even knew of it, or that she had any familiarity with the

unidentified male who made the call. Instead, the only connection

between defendant and this threat was that the unknown male caller

identified himself as a member of the Maniac Latin Disciples, the

gang to which defendant belonged. Defendant contends that this

connection is insufficient to meet the reliability standard for the

admission of evidence at a death sentencing hearing. Moreover,

defendant contends that it is not reliable to infer that, because

defendant had previously spoken with Roberts, she was responsible

for a phone call months later from an unknown man who made the

claim that he would kill her. Because Roberts' testimony as to the

third party threat lacked relevance and reliability, defendant

concludes that it was improperly admitted. Furthermore, because

that testimony concerned the threat to kill a prosecution witness,

it was prejudicial to defendant.

     It is well established that the evidentiary rules which apply

at trial do not apply during the aggravation/mitigation phase of

the death penalty hearing. These rules are inapplicable because it

is important that the sentencing authority possess the fullest

information possible with respect to the defendant's life,

character, criminal record and the circumstances of the particular

offense. See People v. Fair, 159 Ill. 2d 51, 90 (1994); People v.

Brisbon, 129 Ill. 2d 200, 218-19 (1989). The only requirement

regarding admissibility of evidence at this stage is that it be

relevant and reliable, the determination of which lies within the

sound discretion of the trial judge. See People v. Williams, 164

Ill. 2d 1, 27 (1994); see also Fair, 159 Ill. 2d at 89; Brisbon,

129 Ill. 2d at 218; People v. Salazar, 126 Ill. 2d 424, 468 (1988);

People v. Free, 94 Ill. 2d 378, 422-23 (1983).

     After considering Roberts' testimony in light of these

principles, we find her testimony to be both relevant and reliable.

We first note that any evidence regarding a defendant's character,

including proof of prior misconduct that has not resulted in

prosecution or conviction, is relevant. See People v. Patterson,

154 Ill. 2d 414, 476 (1992); Salazar, 126 Ill. 2d at 468. Roberts'

testimony was relevant to defendant's character because it showed

that defendant was responsible for threatening a prosecution

witness. As such, it reflected on defendant's violent character. In

addition to being relevant, Roberts' testimony regarding the phone

threat was also reliable because a combination of factors establish

a sufficient connection between defendant and the third party's

threat. First, defendant and the third party were both high-ranking

members of the Maniac Latin Disciples street gang. Second, the

threat specifically named defendant as the one whom Roberts should

not testify against. The fact that defendant did not directly make

the threat does not make this evidence less reliable given

defendant's prior conversations with Roberts. When defendant

believed that Montanez was going to turn State's evidence on her,

she solicited Roberts to murder Montanez. Following Roberts'

refusal, defendant said she would take care of it herself. When

defendant learned that Roberts herself turned State's evidence,

defendant called Roberts and threatened that she would be "dealt

with later." Then, a week before Roberts was to testify at

defendant's death penalty hearing, she received a threatening phone

call from a Maniac Latin Disciples gang member, who told her that

if she testified against defendant he would have her killed. The

totality of these circumstances demonstrates a sufficient link

between defendant and the last threatening phone call made to

Roberts. Roberts' testimony was therefore properly admissible as

both relevant and reliable evidence.

     Defendant's reliance on our decision in People v. Lucas, 151

Ill. 2d 461 (1992), is misplaced. In Lucas, the defendant was

convicted of the murder of a prison superintendent, a gang-related

crime which occurred in retaliation for the death of another member

of the defendant's gang. This court found that a correctional

officer's testimony regarding gang members' threats of retaliation

was improperly admitted. Lucas, 151 Ill. 2d at 478. This court

relied on the fact that the correctional officer, who testified as

to the threats, stated that defendant did not make the threats.

Lucas, 151 Ill. 2d at 478. Moreover, the court pointed out that the

victim's murder was not close in time to the gang member's death,

which occurred over two months prior to the murder. Lucas, 151 Ill.

2d at 478. This court also determined that evidence of a gang

member's attack upon another correctional officer one day before

the murder and a gang member's threat to poison an inmate who was

cooperating with the prosecution were inadmissible. Lucas, 151 Ill.

2d at 486. We rejected this evidence because there was neither

evidence connecting defendant to the attack on the correctional

officer nor evidence connecting defendant to the plan to poison the

cooperating inmate. Lucas, 151 Ill. 2d at 486. While this court

found error in the admission of this evidence, this court

ultimately determined the error to be harmless. Defendant now

contends that our decision in Lucas demonstrates that mutual gang

membership and mutual gang motivation against a person are

insufficient to establish a connection between a defendant and a

third party's threats.

     This case is distinguishable from Lucas. Initially, we note

that the evidence in Lucas was presented at trial, where strict

rules of evidence apply, whereas Roberts' testimony occurred at the

capital sentencing hearing, where the rules of evidence are

relaxed. More importantly, here there was a prior connection

between defendant and the person receiving the threats, namely,

Roberts. Although defendant did not make the last threatening phone

call, she did have a history of threatening those who crossed her,

including Roberts. Consequently, the connection between defendant

and the threatening phone call in this case involved more than

mutual gang membership and mutual gang motivation. Under the

circumstances of this case, we determine that it is reasonable to

infer that defendant was the source of the threats against Roberts.

     Thus, we hold that the trial court did not abuse its

discretion in allowing Roberts to testify about threatening phone

calls she received prior to her testimony at defendant's death

penalty hearing.

                               E. Mitigation

     Defendant asserts that the trial court erred in refusing to

allow the defense to display defendant's two young children before

the jury during its presentation of mitigating evidence.

     The record reveals that defendant's mother and defendant

testified during the mitigation phase of the sentencing hearing

about defendant's relationship with her children. Defendant's

mother, Angelina Gonzalez, testified that defendant had two

children, Juan Carlos Mulero, age seven, and Mario Canales, age

five, who lived with defendant prior to her incarceration. Mrs.

Gonzalez stated that she brought the children to visit defendant in

jail every week and that defendant exchanged letters with her

children. Mrs. Gonzalez also stated that defendant called her

children frequently and behaved well with them.

     Defendant also testified about her children, who were present

in the courtroom and seated with her mother. Defendant stated that

she was 15 years of age when she had Juan Carlos and 17 years of

age when she had Mario. According to defendant, she raised her

children on her own by working at two jobs. Defendant told the jury

that if she did not get the death penalty she would have a better

relationship with her kids and would be a better mother. She

explained that, even if she should be incarcerated forever, she

could still be a mother to her children by having them visit her in

prison. Defendant further explained that she did not want her

children to testify because she did not want them "to ever grow up

noticing that they went through this trauma." However, defendant

stated that she would not mind if her children were brought before

the jury.

     The trial court refused defense counsel's request to have the

children displayed to the jurors. The court found such evidence to

be improper because it was "an obvious attempt to evoke sympathy"

on behalf of defendant to the jury. Moreover, the court noted that

such a display of the children was unnecessary because there had

already been testimony about defendant's children, and the jury was

aware they were in court.

     Defendant now challenges the court's ruling on the basis that

it was an improper infringement upon her right to present

mitigating evidence. Defendant claims that the physical display of

her children to the jury was proper mitigating evidence because it

would demonstrate the most positive aspect of defendant's

character, namely, her two children. According to defendant, it was

necessary for the jury to view any positive visible aspects of the

children's development, which could then be attributable to

defendant, who alone raised them. In essence, defendant contends

that her children represented physical evidence, which was

necessary to explain testimonial evidence.

     As previously stated, during the aggravation/mitigation phase

of a capital sentencing hearing, the rules of evidence are relaxed

and evidence need only be relevant and reliable to be admissible.

See People v. Brown, 172 Ill. 2d 1, 49 (1996); Patterson, 154 Ill.

2d at 475. The determination of evidence's admissibility at the

second phase of the sentencing hearing lies within the sound

discretion of the trial judge. See Brown, 172 Ill. 2d at 49;

Patterson, 154 Ill. 2d at 475.

     With these principles in mind, we find that the trial court in

the instant case did not abuse its discretion in denying

defendant's request to have her children brought before the jury.

We acknowledge that defendant is entitled to present evidence in

mitigation that is relevant to her character and reliable. See

People v. Edwards, 144 Ill. 2d 108, 174-75 (1991). Here, however,

the physical display of defendant's children to the jury was not

relevant to defendant's character. We agree with the State that the

jury could not have assessed defendant's character as a mother

simply by looking at the children. As such, displaying defendant's

children before the jury was not relevant mitigating evidence.

Accordingly, we conclude that the trial court properly denied

defendant's request.

                        F. Post-Sentencing Hearing

     Defendant asserts that the trial court erred in ruling that

the testimony of the defense's clinical psychologist at the post-

sentencing hearing was not credible where that ruling was based

solely on the fact that the clinical psychologist was not a medical

doctor.

     The record shows that defendant filed a motion to withdraw her

guilty plea after she had been sentenced to death. The trial court

conducted a hearing to determine whether defendant's guilty plea

was intelligent, knowing, and voluntary. At the hearing,

defendant's trial counsel testified that he talked to defendant

three or four times about the plea and explained the advantages and

disadvantages of pleading guilty. Trial counsel stated that he did

not coerce defendant into pleading guilty. Rather, it was

defendant's decision to plead guilty. In fact, according to trial

counsel, defendant directed him to enter her plea of guilty.

Defendant also testified at the post-sentencing hearing and

contradicted trial counsel's testimony. Defendant insisted that it

was trial counsel's idea for her to plead guilty. According to

defendant, she pled guilty because trial counsel did not give her

"much of a choice."

     In addition to defendant, the defense called Dr. Michael

Kovar, a clinical psychologist, to testify at the post-sentencing

hearing. Dr. Kovar testified that he conducted several

psychological tests on defendant. In his opinion, these tests

showed that defendant was highly suggestible and easily misled. Dr.

Kovar believed that defendant was confused about her guilty plea

and did not know the basic facts. Dr. Kovar opined that defendant

was not competent to understand the language used by the judge

regarding the relinquishment of her rights. For example, Dr. Kovar

stated that defendant did not "have a clue" what reasonable doubt

meant, did not understand the burden of proof, and was unsure

exactly what the jury would be selected to hear. Dr. Kovar

attributed defendant's lack of understanding to defendant's

deficiencies in the "fund" of information, vocabulary, and

commonsense reasoning. Based on his test findings, her mental

status, her history and her overall presentation, Dr. Kovar

concluded that defendant's plea of guilty was not knowingly and

intelligently made, given defendant's lack of competence at the

time she pled guilty. Dr. Kovar diagnosed defendant as having a

depressive disorder, a general anxiety disorder, and presently

manifesting borderline intellectual functioning.

     After considering all of the evidence, the trial judge found

Dr. Kovar's testimony to be incredible. The trial judge commented,

"He's not a psychiatrist. He's not a medical doctor." The trial

judge then proceeded to explain that Dr. Kovar's testimony was not

credible based on the fact that he witnessed defendant when she

pled guilty, and he believed trial counsel's testimony that it was

defendant's idea to plead guilty. More specifically, the trial

judge made the following findings:

               "That [the plea] was her choice. She entered that

          plea in front of me. She was admonished as to what the

          penalties were, what her rights were. She indicated to me

          that she understood and I believed her, and I've been

          talking to defendants for a long time, that she did it

          knowingly, voluntarily and intelligently."

The trial judge ultimately denied the motion to withdraw the guilty

plea.

     Defendant contends that the trial court was improper in its

ruling regarding Dr. Kovar's credibility as an expert witness. It

is defendant's position that the trial court rejected Dr. Kovar's

testimony for the sole reason that Dr. Kovar was only a clinical

psychologist as opposed to being a psychiatrist and a medical

doctor. Defendant argues that it was irrelevant that Dr. Kovar was

neither a psychiatrist nor a medical doctor. Because Dr. Kovar was

a registered clinical psychologist, defendant insists that he was

qualified by law to testify as to defendant's state of mind and

mental impairments at the time of her guilty plea. In view of the

trial court's improper basis for finding Dr. Kovar to be

incredible, defendant contends that she is entitled to a new

hearing on her motion to withdraw her guilty plea.

     Initially, we note that a clinical psychologist is qualified

to render an expert opinion as to a defendant's fitness to plead

guilty, stand trial, be sentenced or be executed. 730 ILCS 5/5--2--

5 (West 1992). In fact, the testimony of a clinical psychologist

should not be disregarded merely because that witness is not a

psychiatrist or a medical doctor. See People v. Noble, 42 Ill. 2d

425 (1969). Although a clinical psychologist's testimony should not

be disregarded on this basis, the trial court is not required to

accept the psychologist's opinion that the defendant was not

competent. See People v. Coleman, 168 Ill. 2d 509, 525 (1995);

People v. Pugh, 157 Ill. 2d 1, 24 (1993). It is the trial court's

function to assess the credibility and weight to be given to

psychiatric expert testimony. See Coleman, 168 Ill. 2d at 525.

     After considering the trial judge's ruling, we find that the

trial judge's determination that Dr. Kovar's testimony was

incredible was not improper. We acknowledge that the trial judge

improperly commented about the witness not being a medical doctor

or a psychiatrist. The record, however, demonstrates that the trial

judge did not reject Dr. Kovar's credibility because he was not a

medical doctor or a psychiatrist. Rather, the trial judge did not

agree with Dr. Kovar's conclusions because of his own observations

of defendant while presiding over the proceedings in this case, and

because he found trial counsel to be credible. As stated, the trial

court is not required to accept the expert's finding. Instead, it

is the function of the trial court to assess the credibility of the

expert's testimony. See Coleman, 168 Ill. 2d at 525. Consequently,

the trial judge properly rejected Dr. Kovar's credibility in light

of other evidence. We therefore conclude that the trial judge's

comment regarding Dr. Kovar does not warrant the granting of a new

hearing on the motion to withdraw defendant's guilty plea.

                      G. Sufficiency of the Evidence

     In view of our decision to remand this cause for a new

sentencing hearing, double jeopardy requires that we determine

whether the evidence was sufficient to support defendant's

eligibility for the death penalty. See People v. Brown, 169 Ill. 2d

132, 164 (1996). After considering the evidence in the record, we

find that it supports defendant's eligibility for death based on

the statutory aggravating factors of murder of two or more

individuals (720 ILCS 5/9--1(b)(3) (West 1992)) and murder

committed in a cold, calculated and premeditated manner pursuant to

a preconceived plan (720 ILCS 5/9--1(b)(11) (West 1992)).

Consequently, there is no double jeopardy impediment to defendant's

receiving a new capital sentencing hearing. See Brown, 169 Ill. 2d

at 169. Nevertheless, we do not in any way imply that we have made

a finding as to defendant's eligibility that would be binding on

remand. See Brown, 169 Ill. 2d at 169.

                  II. CONSTITUTIONALITY OF DEATH PENALTY

                                  STATUTE

     As a final matter, defendant challenges the constitutionality

of the Illinois death penalty statute. 720 ILCS 5/9--1 (West 1992).

First, defendant claims that the statute is unconstitutional

because it places a burden of proof on the defendant which

precludes meaningful consideration of mitigation evidence.

Defendant also claims that the statute is unconstitutional because

it allows the sentencer to weigh a vague aggravating factor,

namely, "any other reason" a defendant should be sentenced to

death. This court has already considered and rejected both

arguments. See Munson, 171 Ill. 2d at 203-05; People v. Simpson,

172 Ill. 2d 117, 152 (1996); see also Williams, 173 Ill. 2d at 93-

94; People v. Gilliam, 172 Ill. 2d 484, 522 (1996); People v. Oaks,

169 Ill. 2d 409, 470 (1996); People v. Mitchell, 152 Ill. 2d 274,

345-46 (1992). We decline to reconsider these issues given that

defendant offers no persuasive reasons to depart from our prior

decisions. In a separate argument, defendant contends that the

death penalty statute is unconstitutional because it does not

sufficiently minimize the risk of arbitrarily or capriciously

imposed death sentences. This argument has also been rejected by

this court (see Munson, 171 Ill. 2d at 205-06; Williams, 173 Ill.

2d at 94; see also People v. Tenner, 157 Ill. 2d 341, 390 (1993);

People v. Edgeston, 157 Ill. 2d 201, 247 (1993); People v. Page,

155 Ill. 2d 232, 283-85 (1993); Mitchell, 152 Ill. 2d at 346-47),

and we likewise decline to reconsider our prior decisions because

defendant presents no reasons that warrant a different result in

this case. We therefore adhere to our prior decisions upholding the

constitutionality of the Illinois death penalty statute.

                                CONCLUSION

     For the reasons set forth above, defendant's convictions are

affirmed. Defendant's death sentence is vacated and this cause is

remanded to the circuit court of Cook County for a new sentencing

hearing consistent with the views expressed in this opinion.

Convictions affirmed;

                                                  death sentence vacated;

                                                          cause remanded.